**Slip Op. 03-64**

## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

------------------------------------------------------- x

FORMER EMPLOYEES OF      **:**
MARATHON ASHLAND PIPELINE, LLC,

             Plaintiffs,      **:**          Court No. 00-04-00171
                                                                  **Public Version**

         v.                                  **:**

ELAINE CHAO, UNITED STATES
SECRETARY OF LABOR,

                                 **:**

             Defendant.

------------------------------------------------------- x

[Plaintiffs' Motion for Judgment upon an Agency Record granted; Certification Ordered for TAA Benefits Eligibility.]

                                         Decided:   June 11, 2003

*Katten, Muchin, Zavis, Rosenman*, *(Marianne Rowden, James L. Sawyer)* for Plaintiffs.

*Robert D. McCallum*, *Jr.*, Assistant Attorney General, Civil Division, United States Department of Justice, *David M. Cohen*, Director, Commercial Litigation Branch, *Lucius B. Lau*, Assistant Director, *(Delfa Castillo)*, Trial Attorney; *Gary E. Bernstecker*, Attorney, Office of the Solicitor, Division of Employment & Training Legal Service, United States Department of Labor.

## OPINION

BARZILAY, JUDGE:

### I. INTRODUCTION

Before the court is the *Remand Determination* performed by the United States

Department of Labor ("Labor") pursuant to this court's opinion and remand order. *See Fmr.*

*Emps. of Marathon Ashland Pipeline, LLC v. Chao*, 26 CIT ___, 215 F. Supp. 2d 1345 (2002)

("*Marathon I*"). In *Marathon I* the court considered an appeal from a determination by the

Secretary of Labor denying certification for Trade Adjustment Assistance ("TAA") to former

employees of Marathon Ashland Pipe Line ("MAPL"), who were laid off from their jobs as "gaugers." *See id.* Labor denied their claim reasoning that they were service workers, not production workers - who did not meet the statutory criteria because their separation was caused by the sale of the company division they served, and not the importation of crude oil.[1]

In its remand opinion the court instructed Labor to verify and further investigate the circumstances surrounding the asset sale and specifically Plaintiffs' claims that the sale was prompted by Marathon Oil's increased imports of oil from Mexico and Canada. The remand opinion also instructed Labor to define the term "production" within the context of the oil and gas industry. Regrettably, Labor has not followed the court's remand instructions. For this and other reasons discussed below, the court orders certification of Plaintiffs' petition for trade adjustment assistance.

## II. BACKGROUND

The Plaintiffs in this case are eight former employees of a company called Marathon Ashland Pipe Line LLC. Marathon Ashland Pipe Line is a subsidiary of Marathon Ashland Petroleum LLC. Marathon Ashland Petroleum, in turn, is a partnership owned by Marathon Oil Corporation and Ashland Inc. In March 1999, Marathon Ashland Petroleum announced that it had reached an agreement to sell off one of its subdivisions. *See Remand Determination* at 14.[2]

---

[1] This matter has been before Labor four times: its initial denial on December 28, 1999 (64 Fed. Reg. 72,690, 72,691); its denial of reconsideration (printed in 65 Fed. Reg. 8,743 (Feb. 22, 2000)); its denial upon voluntary remand of August 20, 2001 (printed in 66 Fed. Reg. 52,784(October 17, 2001)); and its denial pursuant to court remand dated October 17, 2002.

[2] For purposes of this opinion, *Remand Determination* refers to the "Notice of Negative Determination of Reconsideration on Remand" by Labor, and the administrative record supporting that notice, done pursuant to this court's order in *Marathon I.* For purposes of

That subdivision, Scurlock Permian LLC, was the "crude oil gathering business" which employed the Plaintiffs. Nothing in the public record indicates why the subdivision was sold. The confidential record before the court gives only vague and generic business reasons.

The sale of Scurlock Permian coincided with several announcements that Marathon or one of its subsidiaries had reached agreements to purchase crude oil from overseas sources, including Canada and Mexico. *See First Remand Determination* at 2. Plaintiffs in this case, who lost their jobs following the sale of the assets, claim that the increase in imports of foreign crude oil contributed to their termination. Plaintiffs worked at the Illinois Basin crude oil field located in Bridgeport, Illinois. Their primary job, according to Labor, was to perform quality control on the crude oil collected in tanks from various independently-operated crude oil sources (called leases). Once the crude was tested and verified for quality, the gaugers would release for delivery amounts sold to the parent company for refining at the Robinson, Illinois plant. Plaintiffs contend that the Robinson plant was "converted" so that it could "refine crude oil imported from Mexico and Canada at cheaper prices, reducing the need for Illinois Basin 'sweet' crude." *First Remand Determination* at 1.

Plaintiffs are seeking TAA benefits. This program "allows workers whose job losses are attributable to import competition to receive unemployment compensation, training, job search, relocation allowances, and other employment services." *Fmr. Emps. of Alcatel Telecomms. Cable v. Herman*, 24 CIT 655, 660 (2000) (citing 19 U.S.C. §§ 2291-2298 and *Fmr. Emps. of*

---

citation, the page numbers of the *Remand Determination* refer to the hand-written, encircled numbers at the bottom of each page of the document. The *First Remand Determination* refers to the notice and record filed by Labor following the voluntary remand which was the decision considered by *Marathon I*.

*Linden Apparel Corp. v. United States*, 13 CIT 467, 715 F. Supp. 378, 379 (1989)). The

requirements for TAA certification are set out in 19 U.S.C. § 2272 (1999). Under the statute, a

three-prong test must be met:

> (a) The Secretary shall certify a group of workers (including workers in any agricultural firm or subdivision of an agricultural firm) as eligible to apply for adjustment assistance under this subpart if he determines–
>
> > (1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,
> >
> > (2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and
> >
> > (3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

This is the third time this case has come before the court. *See Marathon I* at 1349. In

*Marathon I* the court issued a remand order with explicit instructions, having found that Labor's

previous investigation fell "below the threshold requirement of reasonable inquiry by failing to

offer any explanation of the analysis used to determine that Plaintiffs' work as gaugers did not

constitute 'producing' an article within the meaning of Section 2272." *Marathon I* at 1352. The

court was concerned that Labor relied solely on the information provided by the Plaintiffs'

former employer, despite the fact that Plaintiffs had cast doubt on the veracity of those

statements. *Id.* at 1352-53. Labor relied on that information not only to establish facts as to the

nature of the Plaintiffs' work, but also to interpret the statute in question.

> If allowed to stand, the Secretary's negative determination would provide a definition of "production" that excludes those duties performed by gaugers. This definition, however, essentially would be an interpretation of the statute by

> Marathon Ashland's company officials, and not, as the law requires, by the
> Secretary. Whether Plaintiffs provided a service and did not participate in the
> "production" of an "article" within the provisions of Section 2272 is a
> determination that the Secretary must make based on evidence in the record by
> discussing the duties performed by the gaugers and how their responsibilities fit
> into the oil production scheme of their parent company, Marathon Oil.

*Id.* at 1353.

The court also instructed Labor to investigate further "Plaintiffs' claim that imports from Mexico and Canada prompted the sale of Marathon Oil's assets, and as a result, caused the loss of petitioning employees' jobs." *Id.* at 1356 (citations omitted). The court noted that the general business reason given by the company for selling the assets (which led to the Plaintiffs' layoff) was not in conflict with the cause given by the Plaintiffs.[3]

In the *Remand Determination* now before the court Labor again denied TAA certification, finding that the gaugers did not "produce" an article.

> Since the gaugers, who are employed by the pipeline company were
> merely responsible for certifying the quality and quantity of crude oil being
> shipped to customers, the gaugers were not engaged in activities related to the
> exploration or production of crude oil. The gaugers worked from crude oil
> already in tanks. Their functions were after the stage of the production of crude
> oil.

*Remand Determination* at 18-19.

As to the question of whether crude oil imports led to the decision to sell the relevant subdivision the *Remand Determination* states:

> These assets were part of an overall sale of assets by Marathon Ashland
> Petroleum LLC because they were not of strategic value to the company.

---

[3] The remand order also directed Labor to investigate if the gaugers were considered service workers, and whether there were sufficient facts to support extending benefits under that test. *See Marathon I* at 1355. Though Labor failed to adequately address this issue in the *Remand Determination*, it is not integral to the court's disposition here.

Marathon Ashland Pipeline LLC still transports Illinois Basin crude oil (gauged and trucked by various companies from the wellhead to Marathon Ashland Pipeline LLC facilities) to locations determined by the crude oil purchases. The company indicated that the employees at Marathon Ashland Pipe Line LLC, Bridgeport, Illinois were terminated as a result of an asset sale in May 1999, not the decision by Marathon to import crude oil.

*Id.* at 20.

### III. STANDARD OF REVIEW

The court will sustain the Department of Labor's determination if it is supported by substantial evidence and is otherwise in accordance with law. *See* 19 U.S.C. § 2395(b); *Woodrum v. Donovan,* 5 CIT 191, 193, 564 F. Supp. 826, 828 (1983), *aff'd*, 737 F.2d 1575 (Fed. Cir. 1984). The factual findings of the Secretary must be accepted if supported by "substantial evidence." "Substantial evidence has been held to be more than a 'mere scintilla,' but sufficient enough to reasonably support a conclusion." *Former Employees of Swiss Industrial Abrasives v. United States*, 17 CIT 945, 947, 830 F. Supp. 637, 639-40 (1993) (citing *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987)). "Additionally, 'the rulings made on the basis of those findings [must] be in accordance with the statute and not be arbitrary and capricious, and for this purpose the law requires a showing of reasoned analysis.'" *Former Employees of General Electric Corp. v. U.S. Dep't of Labor*, 14 CIT 608, 610-11 (1990) (quoting *Int'l Union v. Marshall*, 584 F.2d 390, 396 n.26 (D.C. Cir. 1978)).

### IV. DISCUSSION

A.      The gaugers are engaged in the production of oil.

To understand the legislative history and role of the workers in this case it is necessary to

provide a basic overview of the industry. The petroleum industry in the United States is divided into various segments. These segments range from exploration to retail operations, with drilling, transportation, refining and other functions in between. Three key segments of the industry are at issue in this case: crude oil production, transportation, and refining. The first step toward producing crude oil is exploring for an oil deposit. Once a site is found, drilling to reach the oil below the earth's surface is the next step. After access to the crude oil reservoir is secured through drilling, the oil is then extracted and placed either into tanks or funneled directly into a mode of transportation. These modes include sea-borne tankers, trucks, railroad cars and pipelines. The crude is then transported from the site of the extraction to a refinery, where it is converted into various fuels, including gasoline.

The term gauger encompasses multiple tasks within the industry. The gaugers at issue here fall under the most common definition. They performed "quality control" on the crude oil extracted from the wells, to guarantee that it was "acceptable for purchase." *Remand Determination* at 18. If the gaugers determined the oil was not acceptable for purchase, it was not allowed to enter into the pipeline or be loaded onto trucks for transport to the Robinson refinery location. If it was acceptable for purchase, gaugers would control the quantity of oil released from the tanks and into the "stream of commerce."

In order to qualify for TAA, the gaugers at issue in this case must have been employed by a "firm, or appropriate subdivision of a firm, that engages in exploration or drilling for oil or natural gas, or otherwise produces oil or natural gas." § 2272(b)(2)(B). In this case, the gaugers perform their function after the exploration and drilling stage, so the only issue is whether they

otherwise produce oil.[4]  The court must then determine what constitutes the production of crude

oil for purposes of the statute, and whether the work of the gaugers falls within that production

process.  Two significant production segments exist in the industry, extracting crude from the

earth and refining that crude for use as fuel in various applications.  The pipeline industry (and

other transportation modes) integrates the two segments by making possible the introduction of

crude oil into the refining segment.[5]  The gaugers performed a unique role in this system. The

gaugers at issue guaranteed the quality of the extracted crude which was a benefit to both the

lease operators who pumped the oil and the refining company that purchased the product.  They

performed their job at an oil field where crude oil was produced, and without the gauging

function no crude could be sold and released from the production site.

---

[4] Workers who are considered to be providing merely a "service" as opposed to actually engaged in "production" may still qualify for TAA benefits, however the test is more stringent. *See Marathon I* at 1353 *see also Abbott v. Donovan*, 6 CIT 92, 101, 570 F. Supp. 41, 49-50 (1983) (remanding a Labor determination for lack of supporting data to determine causal nexus between service workers and increased imports, where plaintiffs did not challenge their status as service workers).

[5] Labor implicitly breaks the petroleum industry into two distinct production processes, one being oil and gas extraction, the other being refining.  This determination excludes transportation as part of the production process.  The court notes that this determination is not demanded by the statute.  Indeed, Labor's decision to break up the petroleum industry suffers from the same lack of support as its determination about the scope of the phrase "otherwise produces oil."  A different interpretation is that the petroleum industry is a chain of segments, from exploration through refining, and that there is a single production process, which begins, according to the 1988 amendments, with exploration.  *See Save Domestic Oil v. U.S.*, 24 CIT 994, 1013, 116 F. Supp. 2d 1324, 1341 (2000); *see also* H.R.Conf. Rep. 100-576 at 694 ("the oil and gas industry (exploration to refining)").  Those integral to that chain of production, including pipeline workers, could be considered producers for purposes of eligibility.  In order to grant relief in this case, the court need not reach the issue of whether Labor's interpretation of the 1988 amendments on this point is supportable.  *See United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001).  However, nothing in this opinion should be seen as affirming that part of Labor's interpretation.

The *Remand Determination*, relying solely on the description provided by the Human Resources Representative of MAPL, described the gaugers' role as the following:

> They were responsible for determining the quality and quantity of crude oil bought by the purchasing company from third party leases. The gaugers were responsible for ensuring quality control by collecting representative samples from crude oil tanks and certifying that the crude oil was acceptable for purchase. Once the crude oil quality was certified, the gauger would verify the quantity of the product from the tank and allow delivery into the Marathon Ashland Pipe Line facility either by truck to the pipeline or directly into the pipeline. After the crude oil was placed in the pipeline, it was then delivered to the customer's specified destination or Marathon Ashland Petroleum's refinery in Robinson, Illinois. Thus, based on the functions performed by the gaugers they did not "produce" an article.

*Remand Determination* at 18.

The *Remand Determination* goes on to explain that "[t]he gaugers worked from crude oil already in tanks. Their functions were after the stage of the production of crude oil." *Id.* at 19. The court notes that after describing the gaugers' duties as primarily related to "quality control" of the tanks, and done before any oil was purchased and released into the pipeline, the *Remand Determination* states that the gaugers "were primarily responsible for activities related to the transportation of crude oil." *Id.* at 18. Labor essentially describes the gaugers as performing their job prior to the point at which the oil is transported and doing "quality control" unrelated to transportation, yet concludes the gaugers' role was one primarily related to "transportation." This conclusion has no relationship to the description above, and there is nothing in the record to support it, except, perhaps, the fact that the gaugers were employees of a company with the word "pipeline" in its name. *Id.* at 6. Moreover, this conclusion contains nothing with regard to the critical legal determination that must be made, whether the gaugers are employed by a subdivision of a firm that produces oil.

Under the law, courts will generally grant some deference to an agency's interpretation. *See Mead,* 533 U.S. at 227-28 (citing, *inter alia*, *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 845 (1984) and *Skidmore v. Swift & Co.*, 323 U.S. 135, 139-40 (1944)) . However, it is incumbent upon the agency to exhibit reasons for its choices, and those reasons must be plausible. *See Madison Gas & Elec. Co. v. E.P.A.*, 25 F.3d 526, 529 (7th Cir. 1994); *see also S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable."). Here, there was no attempt by Labor to propound a coherent legally sufficient definition of a key term in the statute - production. In *Marathon I*, this court criticized Labor for failing to "interpret the meaning of 'production' under Section 2272." *Marathon I* at 1353. Despite this admonition, the *Remand Determination* does not define the term production, nor does it provide any support for its conclusion that the gaugers do not engage in production. It does not attempt to define or describe the production process. It does not explain why gauging raw crude to determine if it can be sold for refining does not qualify as part of the production process. It does not say at what point the production process ends. It does not explain why oil already "in tanks" falls outside the production process.[6] It does not explain why gaugers who monitor the quality and quantity of oil going directly into the

---

[6] Defendant in its brief states, "[i]t is not clear from the record whether the crude oil was always stored in tanks or whether some may have come directly from a wellhead. Both scenarios would result in a negative determination under the facts of this case." *Def.'s Resp. to Pls.' Mot. for Summ. J. on the Admin. Rec.* at 8. The court agrees that it is not relevant whether the oil was sent into a pipeline directly from the wellhead or from tanks to determine whether the gaugers were engaged in production. In fact, according to Labor's description of the gaugers' job, it is not relevant whether it went into a pipeline or fed directly into a refinery. The gauger role was necessary no matter how, or if, the crude was transported. As discussed below, transportation is tangential to the gaugers' job.

pipeline (and not into tanks), are not part of the production process. It does not explain why quality control may be different for oil than for other products. It does not explain how a raw product like crude oil can be "produced" at all. It does not explain how workers employed by the pipeline company were able to work on oil tanks owned by the crude oil producers, but not be part of the production process. In the absence of any attempt by the responsible agency to discern the statutory meaning of the phrase "otherwise produces oil," the court must look to other sources.

The court begins with the language of the statute. To discern what Congress intended to be the scope of the crude oil production process the court must establish if phrase "produces oil" has a commonly understood meaning. *See Perrin v. United States*, 444 U.S. 37, 42 (1979) ("[W]ords will be interpreted as taking their ordinary, contemporary, common meaning.") (citing *Burns v. Alcala*, 420 U.S. 575, 580-581(1975). The traditional test used by this Court and Labor in TAA cases to determine if workers are part of the production process is whether the firms where the employees work "create or manufacture a tangible commodity, or transform it into a new and different article." *Nagy v. Donovan*, 6 CIT 141, 145, 571 F. Supp. 1261, 1264 (1983). However, this test is not always applicable. In some cases articles produced are not complicated. They are simple products, such as steel pipe, in which a minor act results in an alteration. *See Fmr. Emps. of Shaw Pipe v. U.S. Sec'y of Labor,* 21 CIT 1282, 1287, 988 F. Supp. 588, 592 (1997). This is especially true of crude oil. The essential quality of the product never changes, as its name indicates. Even those workers clearly fitting under the rubric of oil production do not manufacture, create or transform. Therefore, an explanation of the phrase "otherwise produces oil" cannot rest solely on a generic meaning of the term production, but must take into account

the specific nature of the crude oil industry.

The U.S. Department of Labor, Bureau of Labor Statistics (BLS), *Career Guide to Industries*[7] describes the crude oil production process in the following manner:

> When oil or gas is found, the drill pipe and bit are pulled from the well, and metal pipe (casing) is lowered into the hole and cemented in place. The casing's upper end is fastened to a system of pipes and valves called a wellhead, or "Christmas tree," through which natural pressure forces the oil or gas into separation and storage tanks.

The process is not complex. Crude oil is drawn from the ground. Natural gas is separated out. The oil is placed in tanks. Gaugers monitor those tanks for quality control. When a purchase is made the gaugers then measure out the quantity to be released. The only real production process at issue is the movement from underground to above-ground and the separation of crude oil and accompanying natural gas. The gaugers verify that the crude oil can be sold. It is clear that gaugers are integral to this production process. If the crude oil were never transported and, instead, fed directly into a refinery, gaugers would still be necessary. The gaugers do most, if not all, of their work before the crude oil is purchased or transported. *Remand Determination* at 18. Labor's determination that the gaugers "were primarily responsible for activities related to the transportation of crude oil," is undermined by its own description of the oil production process. *See id.*

The *Career Guide to Industries*, under the heading "Oil and Gas Extraction" states the following:

> *Pumpers* and their helpers operate and maintain motors, pumps, and other surface equipment that force oil from wells and regulate the flow. . . . *Gaugers* measure and

---

[7] The Career Guide to Industries is available at http://stats.bls.gov/oco/cg.

record the flow, taking samples to check quality.[8]

(emphasis in original).  Under the category of "Production occupations" the *Career Guide to*

*Industries* lists the following categories:

>   First-line supervisors/managers of production and operating workers
>
>   Welders, cutters, solderers, and brazers
>
>   Petroleum pump system operators, refinery operators, and gaugers.

Labor's descriptions of the oil production process indicate a common understanding that

the production process includes the point at which the crude is pumped into "separation and

---

[8] This description of the oil production process and the role of gaugers within it is consistent with the Department of Labor, *Dictionary of Occupational Titles* (http://www.oalj.dol.gov/public/dot/REFRNC/DOT09A.HTM), which gives the following entry:

**914.384-010 GAUGER (petrol. & gas; petrol. refin.; pipe lines) alternate titles: field gauger; pipe-line gauger; tank-farm gauger; terminal gauger**
  Gauges and tests amount of oil in storage tanks, and regulates flow of oil and, other petroleum products into pipelines at wells, tank farms, refineries, and marine and rail terminals, following prescribed standards and regulations: Gauges quantity of oil in storage tanks before and after delivery, using calibrated steel tape and conversion tables. Lowers thermometer into tanks to obtain temperature reading. Turns bleeder valves, or lowers sample container into tank to obtain oil sample. Tests oil to determine amount of bottom sediment, water, and foreign materials, using centrifugal tester. Calculates test results, using standard formulas. Records readings and test results. Starts pumps, and opens valves on pipelines and tanks to regulate and direct flow of oil from and into tanks, according to delivery schedules. Reads automatic gauges at specified time intervals to determine flow rate of oil into or out of tanks and amount of oil in tanks. Inspects pipelines, valves, and flanges to detect malfunctions, such as loose connections and leaks. Tightens connections with wrenches, greases and oils valves, using grease gun and oilcan. Reports leaks or defective valves to maintenance personnel. Clamps seal around valves to secure tanks. May gauge tanks containing petroleum and natural gas byproducts, such as condensate or natural gasoline. May operate pumps, teletype, and mobile radio. May clean pumps, machinery, and equipment. May issue delivery or receiving tickets. May record meter and pressure readings at gas wells. May regulate flow of products into pipelines, using automated pumping equipment. When gauging oil received from and delivered to terminals, tank farms, and refineries, may be designated Gauger, Delivery (pipe lines).

storage tanks." Furthermore, at least one bureau within the Department of Labor places the work done by gaugers squarely within the production process, along with pump system operators.

Courts have affirmed Labor, upon occasion, when it denied certification to workers considered outside the production process. These cases often turn on whether the workers in question perform their job prior to the good being released into the stream of commerce. In *Pemberton v. Marshall* the Court of Appeals for the District of Columbia affirmed a Labor decision to deny benefits to workers who performed repairs and maintenance on marine vessels. 639 F.2d 798 (1981). The Secretary found that the work done at the shipyard was a service and not production. The Court upheld the Secretary's reasoning:

> The repair and maintenance of a ship is clearly a service to an existing commodity. Even if the repair necessitates the use of new materials, it cannot be said to be the creation of a new ship any more than overhauling an automobile can be said to manufacturing a car.

*Id.* at 800. In this case, however, crude oil does not "exist" as a "commodity" until after the gaugers perform their job.

In *Woodrum v. Donovan* this Court followed the reasoning of the *Pemberton* court and affirmed a decision by Labor to deny benefits to workers at a car dealership that repaired and inspected cars prior to their retail sale. 5 CIT 191, 192-93, 564 F. Supp. 826, 828 (1983). The Court agreed with Labor that the workers "did not manufacture new articles." *Id.* at 832. The Court quoted *Pemberton* for the proposition that "semantics do not overcome the reality that nothing new is entered into the stream of commerce. *Id.* (quoting *Pemberton*, 639 F.2d at 800.)

In contrast to the workers in *Pemberton* and *Woodrum*, all of the work done by the gaugers here was done before the oil "entered into the stream of commerce." Using entry into the pipeline as the end point for the crude oil production process is supported by the United

States Department of Energy's method of determining the amount of crude oil production.  The

Energy Information Administration, *Definition of Petroleum Products and Other Terms*, defines

"Crude Oil Production" as:

> The volume of crude oil produced from oil reservoirs during given periods of
> time.  The amount of such production for a given period is measured as volumes delivered from
> lease storage tanks (i.e., the point of custody transfers) to pipelines, trucks, or other media for
> transport to refineries or terminals with adjustments for (1) net differences between opening and
> closing lease inventories, and (2) basic sediment and water (BS&W).

Therefore, following the reasoning of *Pemberton* and *Woodrum* requires that the gaugers

at issue here be considered part of the crude oil production process.  If the production process is

complete when the goods enter the stream of commerce, then the *Remand Determination's*

description of their role places the gaugers squarely within the definition of production.  *See*

*Remand Determination* at 18.  Such a reading is also consistent with descriptions of the oil and

gas industry used by Labor and the Department of Energy.

Still, it is possible that even though the gaugers at issue performed their tasks prior to the

crude entering the stream of commerce, they might be considered service employees because of

the nature of their work.  The court now turns to the question of whether the work performed by

the gaugers should be considered production or service.

As noted above, the Department of Labor, Bureau of Labor Statistics classifies "gaugers"

under the general heading of "production occupations" within the oil and gas extraction field.

BLS lists them as similar to "petroleum pump system operators."  The *Remand Determination*

describes the gaugers as "responsible for quality control by collecting representative samples

from crude oil tanks and certifying that the crude oil was acceptable for purchase."  *Remand*

*Determination* at 18.  Labor gives no reason why it does not consider "quality control" part of

the production process. The term "quality control" is a common business term often associated

with the manufacturing process. The *Dictionary of Business and Economics* defines the term as

follows:

> In business and industry, the system of methods, procedures, and policies
> used to maintain acceptable and dependable levels of quality in a company's
> output of goods and services, as well as in its purchases. . . . In industrial
> organizations quality control is usually part of the manufacturing division.

Christine Ammer & Dean S. Ammer 348 (1977). This definition is consistent with the

description provided by Labor of the gaugers providing quality control for the oil to guarantee

that it is appropriate to be sold. As the *Dictionary of Business and Economics* states, quality

control is generally considered part of the production process.

The foregoing discussion indicates that the common and generally accepted

understanding of the phrase "otherwise produces oil" includes work done by those workers who

act prior to the time the oil is transported. The court also notes that including the gaugers within

the scope of oil production for purposes of TAA is consistent with the intent of the statute to

assist those workers who lose their jobs because of "increases of imports of articles like or

directly competitive with articles produced by such workers' firm or an appropriate subdivision."

§2272(a)(3). In the crude oil industry, an increase in crude oil from foreign sources places

domestic gaugers in direct competition with those workers who perform the same function in the

production process overseas.

Generally, the court will "assume 'that the legislative purpose is expressed by the

ordinary meaning of the words used.'" *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987)

(citations omitted). However, it is also appropriate to consult the legislative history to confirm

congressional intent. *See id.* at 432. The court finds the "message conveyed by the plain

language of the [statute] is confirmed by an examination of its history." *Id.* In 1988 several

amendments were made to the provisions of the United State Code which govern the Trade

Adjustment Assistance program. Some of these changes directly addressed workers in the oil

and gas industry. Employees of firms or subdivisions that produce oil or natural gas were

explicitly covered, and Congress made clear that workers engaged in crude oil exploration and

drilling should be considered part of a broader category of those who produce oil or natural gas.

This amendment was in response to a Labor determination appealed to this Court. *See*

*Former Employees of Zapata Offshore Co. v. United States*, 11 CIT 841 (1987). In *Zapata*, the

Court affirmed a determination by Labor that workers engaged in the drilling of offshore oil

wells did not produce oil, but, rather, performed a service in support of oil production. The

Court noted that the relevant provisions of the Act and its legislative history were silent "as to

what Congress intended with respect to workers in the oil industry and contains no discussion as

to how to interpret the term "produced." *Id.* at 845.

With the 1988 amendments Congress filled this void. During consideration of the

Omnibus Trade and Competitiveness Act of 1988, the Senate included language that would have

> expand[ed] eligibility to all workers and firms in the oil and natural gas industry
> (exploration to refining) and to workers and firms who supply essential goods or
> essential services as their principal trade or business to firms in the oil or natural
> gas industry.

H. R. Conf. Rep. No. 100-576, at 694, *reprinted in* 1988 U.S.C.C.A.N. 1547, 1727.[9]

Although the House of Representatives did not address the issue of the treatment of oil

---

[9] Labor denied certification of the oil and gas workers in *Zapata* on November 4, 1986 (*see Zapata*, 11 CIT at 842). On March 12, 1987, Sen. Johnston introduced S. 734, to extend coverage to "any affected worker in the whole oil and natural gas chain." Statement of Sen. Johnston, 133 Cong. Rec. S3100. It appears that the language of S. 734 was then inserted into the Senate version of the Omnibus Trade and Competitiveness Act of 1988.

and gas workers in its version of the trade bill, the Conference Report included language

providing coverage to these workers. The Conference Report granted TAA "eligibility to

workers and firms engaged in exploration and drilling in the oil and gas industry. . . . on the

same basis as workers employed by firms that are engaged in the production of crude oil." *Id.*

The report provides additional explanation and background as to the amendments' intent and

purpose:

> The purpose of this amendment is to facilitate the availability of benefits under the trade adjustment assistance program for workers employed by firms engaged in exploration or drilling for crude oil or natural gas. Under present law, workers employed by such firms have been denied program benefits because they are not considered to be employed by firms that produce articles that are like or directly competitive with increased imports. However, under present law, workers engaged in exploration or drilling for firms that also produce crude oil or natural gas are considered as eligible to apply for such benefits.
>
> The conferees intend that workers employed by independent firms engaged in exploration or drilling be eligible to apply for program benefits on the same basis as workers employed by firms that are engaged in the production of crude oil or natural gas as well as exploration or drilling. Thus, a group of workers in a firm engaged in exploration or drilling could be certified as eligible for program benefits if the Secretary of Labor determined that increased imports of crude oil or natural gas contributed importantly to their unemployment and to a decline in sales by such firms (providing that the other requirements under the law for certification were met).
>
> The conferees do not intend that certification of workers from independent firms engaged in exploration or drilling serve as a basis for certifying workers from producing firms to which such exploration or drilling workers provide services if such production workers have not petitioned for such certification.
>
> Because exploration, drilling, and production activities in the crude oil and natural gas industries are inextricably linked, the amendment provides that workers engaged in exploration, drilling, or production of either crude oil or natural gas shall be considered as producing either product. Typically, the imports that have had an adverse impact on these workers in recent years are of crude oil.
>
> For the purposes of this amendment, the conferees consider firms engaged in exploration or drilling to include, for example, independent drillers, pumpers, seismic and geophysical crews, geological crews, and mud companies.

*Id.*

> Thus, the 1988 amendments settled the question of when the production of crude oil

begins, but did not explicitly state when it ends. However, the amendments do provide some guidance on this question. Prior to the 1988 amendments the statute was silent with respect to the oil and gas industry. *See Zapata*, 11 CIT at 845. The amendments added two relevant provisions under § 2272(b)(2):

> (A) Any firm, or appropriate subdivision of a firm, that engages in exploration or drilling for oil or natural gas shall be considered to be a firm producing oil or natural gas.
> (B) Any firm, or appropriate subdivision of a firm, that engages in exploration or drilling for oil or natural gas, or otherwise produces oil or natural gas, shall be considered to be producing articles directly competitive with imports of oil and with imports of natural gas.

The language of the amendments indicates that Congress intended to expand Labor's existing definition of oil production to include exploration and drilling. After drilling the next step is pumping the crude into tanks or directly into a pipeline. Gaugers play an integral role in this step of the production. The legislative history to the amendment supports the idea that Congress intended to enlarge a restricted interpretation of what it means to produce oil. "The amendment provides that workers engaged in exploration, drilling, or production of either crude oil or natural gas shall be considered as producing either product." H. R. Conf. Rep. No. 100-576 at 694. The effect of requiring that persons engaged in these activities be considered "producing oil" means that they can apply for TAA benefits on their own, regardless of whether the firm employing them performs all of the production functions or only one of them. This means that many of the small firms and independent contractors that perform some component function toward the overall production of oil are considered producers of oil, and not as merely providing a service to an oil production company. In 1988, Congress explicitly expanded the TAA provisions of the statute to include oil and gas workers, the only occupation other than agricultural workers specified. When they did so it was with the clear intent to broaden the

definition of production.  The purpose of the amendments was to help those workers impacted by a significant increase in crude oil imports.  *See id.* ("Typically, the imports that have had an adverse impact on these workers in recent years are of crude oil.").

In *Zapata*, the pre-1988 case, the Court said that if drilling is not considered production, then production would presumably include "those companies which own the wells and manage the extraction of the oil." *Zapata*, 11 CIT at 846.  To manage the extraction, it is necessary to verify that the oil being pumped from the ground is of such quality that it can be sold.  Including quality control as part of the production process (as opposed to an outside service) is consistent with the common business understanding of the term.  Including gaugers as part of the oil production process is consistent with their classification by the Department of Labor, Bureau of Labor Statistics.  Placing the gaugers within the production process is also consistent with previous cases before the courts which hold that production extends to the point goods are placed into the stream of commerce.

The court finds that the Plaintiffs in this case engaged in the production of crude oil, by definition of their job as described by Labor's *Remand Determination*.  As either independent contractors or as employees of Marathon Ashland Pipe Line, they were employed by a "firm, or appropriate subdivision of a firm, that engages in exploration or drilling for oil or natural gas, or otherwise produces oil or natural gas."

B.     Labor has failed for the fourth time to investigate Plaintiffs' claim that crude oil imports
       led to the company's decision to sell assets.

In their original complaint before this court contesting the denial, Plaintiffs reasserted all arguments made originally before the agency and additionally claimed that the Secretary failed

to request information concerning: 1) Marathon Oil's importation of foreign oil between 1997

and 1999; 2) the extent to which the importation of oil by Marathon Oil caused or contributed to

Marathon Ashland's decrease in domestic oil production and sales; 3) the basis for Marathon

Oil's cessation of purchasing oil from the Illinois Basin Area; and 4) the nexus between

Marathon Ashland's activities and the crude oil purchased or produced by its parent or related

companies.  Plaintiffs asked that the Secretary's determination be reversed or, in the alternative,

remanded back to Labor for further investigation.

> The court generally agreed with Plaintiffs and remanded to the Secretary, noting,

> while "this court will defer to [Labor's] choice of reasonable methodologies, Labor must base its determination upon sufficient evidence for a reasonable mind to concur in the result." *Bennett* [*v. U.S. Sec'y of Labor*, 18 CIT 1063,1068 (1994)].  Here, on the facts at odds in the record, Labor could not have conclusively determined that imports did not contribute to the petitioning workers' separation.  Plaintiffs do not dispute evidence showing that company assets were sold to [ ]; however, Plaintiffs submit that these assets were sold because [" ."] A.R. at 1.  In its negative determination, Labor ignored the issue of whether Marathon Oil's decisions to purchase crude oil imported from Mexico and Canada resulted in the sale of company assets.  Such information is crucial in ascertaining the impact of imports on the loss of Plaintiffs' jobs.
>
> An adequate investigation by Labor would have addressed Plaintiffs' claim that imports from Mexico and Canada prompted the sale of Marathon Oil's assets, and as a result, caused the loss of petitioning employees' jobs. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (stating that an administrative determination is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem").  In order to fulfill its duty to conduct an investigation with the utmost regard for the petitioning workers, Labor should conduct a thorough investigation to fully assess both [MAPL Human Resources Representative's] information and Plaintiffs' claims.  The failure to do so would render the Secretary's investigation cursory at best.

*Marathon I* at 1355-56.

Despite these clear instructions, Labor's current determination falls short.  The findings

and analysis part of the *Remand Determination* (excluding the agency record) consists of five

pages.  The record of the investigation pursuant to remand contains two exchanges of letters with

company officials and two press releases announcing the sale.  Labor did inquire specifically in

its letter of August 12, 2002

> 3)    Were the layoffs at the Bridgeport, Illinois (Illinois Basin) related to a
>        decision by Marathon Oil to import crude oil?  Explain in detail.
>
> 4)    Describe in detail the reasons for the sale of Marathon's oil assets
>        at Illinois Basin Lease.

*Remand Determination* at 1.

The company human resource representative responded by essentially giving the same

answer he provided in the *First Remand Determination*.  He stated that the assets were sold

because they were no longer of strategic value to the company.  *See Remand Determination* at

20.  The *Remand Determination* states the gaugers were "terminated as a result of an asset sale in

May 1999, not the decision by Marathon to import crude oil."  Interestingly, the letter upon

which this statement is based does not say that Marathon made a "decision to import crude oil."

*See Remand Determination* at 7.  The letter also does not state that the asset sale was unrelated to

any decision to import crude oil.  The letter does not answer, and, indeed, does not even dispute,

Plaintiffs' contention that the Robinson, Illinois plant was converted to refine foreign oil.  The

*Remand Determination* does not answer, nor does it dispute, Plaintiffs' charge that the Robinson

refinery was converted to process a greater amount of foreign crude.[10]

_____

[10] Not all crude is the same.  According to the Energy Information Administration of the
U.S. Department of Energy, the "quality of crude oil dictates the level of processing and re-
processing necessary to achieve the optimal mix of product output."  A shift in the type of crude
used by a refinery will shift how the crude is processed. Generally crude oil is classified based
on its density (light or heavy) and sulfur content (sweet or sour). Plaintiffs describe the crude
gauged from the Illinois Basin as "sweet."  The crude which Marathon Ashland Petroleum
contracted to purchase from Mexico, according to their press release was "heavy Maya crude

Labor's and the company's inability or unwillingness to answer with any specificity the questions necessary for this court to evaluate the legitimacy of Plaintiffs' claim place the court in a difficult position. This court retains the ability to remand again, "for good cause shown," 19 U.S.C. § 2395(b), or can order the Secretary to certify Plaintiffs for eligibility. *See United Elec., Radio and Mach. Workers of Am. v. Martin*, 15 CIT 299, 308 (1991) (citing 19 U.S.C. § 1395(c) (which confers on this Court "jurisdiction to affirm the action of the Secretary of Labor . . . or to set such action aside, in whole or in part."))[11]

Labor has had four chances to determine whether the Robinson plant was converted to accommodate increased foreign crude imports, and if those increased imports contributed to the decision to sell the assets in question.[12] Plaintiffs have placed serious, specific and relevant questions in the record that Labor did not adequately address, even after being directed by this court to do so. Therefore, no evidence exists in the record to support Labor's conclusion that the gaugers' termination was not the result of a decision by Marathon to import crude oil. *See Fmr. Emps. of Hawkins Oil v. Labor*, 17 CIT 126, 130, 814 F. Supp. 1111, 1115 (1993) ("[T]he Court has combed the administrative record in search of substantial evidence to support Labor's determination.").

---

oil."

[11]In *Fmr. Emps. of Tyco Electronics, Fiber Optics Div. v. United States*, this Court recently noted a number of instances when the Court has become so exasperated by Labor's refusal or inability to comply with remand orders in TAA cases that it ordered certification. Slip Op. 03-49 at 13, 18-19, 27 CIT __, __, (2003).

[12] Plaintiffs' contention that Marathon was importing a significant amount of foreign crude oil is plausible. *Defendant's Response Brief* notes that some Marathon Oil workers in other states were certified for TAA benefits for the same relevant time period for which the Plaintiffs are seeking TAA.

As a general rule, the court will refrain from ordering certification until an additional remand would be "futile." *See Fmr. Emp. of Barry Callebaut v. Herman*, 26 CIT ___, ___, 240 F. Supp. 2d 1214, 1228 (2002) (citing *Hawkins Oil*, 814 F. Supp. at 1115). During the last remand Labor directly asked MAPL to "describe in detail" the business reason for the sale of the assets. In response, MAPL essentially said it had business related reasons. This is not an adequate answer. Nothing in the record indicates that MAPL will be more forthcoming if the court were to remand again. Nothing in the record indicates that Labor has the resources or willingness to conduct an investigation beyond making inquiries of MAPL. The court sees little benefit to be gained by an additional remand.

TAA is a remedial program. *See Woodrum*, 564 F. Supp. at 833. Its purpose is to assist those workers and communities harmed by the impact of international trade to recover from the losses they incur. *See Linden Apparel*, 715 F. Supp at 379. Congress has recognized that the loss of jobs in specific communities is the price paid for the overall public benefit of a liberalized international trading system. *See Int'l Union*, 584 F.2d at 395. The court is mindful that TAA cases are different from most litigation before this court. This is not a situation, such as in customs or antidumping duty cases, where a bond can be posted to cover anticipated cost and reduce liability. The workers at issue here suffered a loss. To perpetually delay remedying that loss would inflict additional hardship contrary to the purpose of the statute. *See Fmr. Emps. of Parallel Petroleum Corp. v. U.S. Sec'y of Labor*, 14 CIT 114, 119, 731 F. Supp. 524, 527 (1990). In weighing the decision to remand the court must consider the purpose of the statute and factor the welfare of the workers into its decision to bring the litigation to a conclusion. *See United Elec., Radio & Mach. Workers of Am.*, 15 CIT at 308. The gaugers at issue filed for TAA benefits on October 23, 1999, approximately three and a half years ago. Past experience

compels the court to conclude that the likely result of any remand will be only a marginally more supported investigation which will not significantly assist the court in determining whether crude oil imports directly led to the gaugers' termination. For such a small benefit, the court sees no reason to delay extending real benefits to the Plaintiffs.

## IV. CONCLUSION

The court finds that Labor's denial of Plaintiffs' petition for certification is not supported by substantial evidence and not in accordance with law, and, therefore, the Secretary of Labor shall certify Plaintiffs as eligible for trade adjustment assistance. Plaintiffs' motion for judgment on an agency record is granted. Judgment will be entered accordingly.

Dated:_____                              _____
      New York, New York                                    Judith M. Barzilay
                                                Judge