**Slip Op. 03-171**

UNITED STATES COURT OF INTERNATIONAL TRADE

——————————————————————————
FORMER EMPLOYEES OF CHEVRON
   PRODUCTS COMPANY,

                 *Plaintiffs*,

                 v.

UNITED STATES SECRETARY OF LABOR,

                 *Defendant*.
——————————————————————————

Court No. 00-08-00409

[Corrected Final Remand Determination, certifying Plaintiffs as eligible to apply for trade adjustment assistance benefits, is sustained.]

Decided: December 30, 2003

Meeks & Sheppard (Ralph H. Sheppard and Diane L. Weinberg), for Plaintiff.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Henry R. Felix); Louisa Reynolds, Office of the Solicitor, United States Department of Labor, Of Counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

Four long years ago, Plaintiffs ("the Workers") – then employed as "gaugers"[1] – lost their

---

[1]As "gaugers" in the petroleum industry, the Workers here were basically responsible for "testing and determining the quality of crude oil to be purchased and transported." *See* Former Employees of Marathon Ashland Pipeline, LLC v. Chao, 26 CIT ____, ____, 215 F. Supp. 2d 1345, 1347 (2002). Specifically, the Workers labored at "well head[s] and or crude oil tanks," performing various tasks to determine whether crude oil should be purchased – "[c]heck[ing] temperature, gaug[ing] the amount of crude in the tank, tak[ing] samples for gravity test and grind out for BS&W,

jobs with the Roosevelt Terminal unit of Chevron Products Company ("CPDS"), due to increased imports of oil. Although the Workers timely applied to the U.S. Department of Labor ("Labor Department") for certain benefits, those benefits were denied.

The Workers brought this action to contest the Labor Department's determinations denying their petition for transitional adjustment assistance benefits under the North American Free Trade Agreement ("NAFTA") Implementation Act, and denying them benefits as "secondarily-affected workers" under the Statement of Administrative Action accompanying the NAFTA Implementation Act. Complaint; 65 Fed. Reg. 30,442, 30,444 (May 11, 2000); 65 Fed. Reg. 46,988-89 (Aug. 1, 2000); AR 18-19, 32-38.[2] However, as discussed in greater detail below, the NAFTA-TAA petition that is the predicate for this action was spawned by the Workers' earlier petition under the general trade adjustment assistance provisions of the Trade Act of 1974 (the "TAA" statute). And that petition, in turn, implicates another petition filed earlier, under the same statute, by a related group of workers. This action thus involves three separate, intertwined Labor Department investigations.

_____

and check[ing] the bottom of the tank for water or impurities." If the samples were satisfactory and all tests were passed, "a crude oil run ticket [was] written up" and "drivers were dispatched to the location . . . [to] load[ ] the crude oil on [their] truck[s] and transport[ ] it" to the refineries. Former Employees of Chevron Products Co. v. U.S. Sec'y of Labor, 26 CIT ____, ____ 245 F. Supp. 2d 1312, 1319 (2002) ("Chevron I") (citation omitted).

[2]Because this action was remanded to the agency, there are two separately-paginated administrative records – the initial Administrative Record, and the Supplemental Administrative Record (compiled in the course of the first remand). Further, because this action includes confidential information, there are two versions of each of those records. Citations to the public version of the Administrative Record are noted as "AR ___," while citations to the confidential version are noted as "CAR ___." There are no references herein to either the public version or the confidential version of the Supplemental Administrative Record. Moreover, because the Labor Department certified the Workers after the action was remanded for the second time, the agency did not further supplement the administrative record filed with the Court.

Jurisdiction lies under 19 U.S.C. § 2395(c) and 28 U.S.C. § 1581(d)(1) (1994).[3]  Pending

before the Court is the Labor Department's Notice of Revised Determination on Reopening

(Corrected: September 25, 2003) ("Corrected Final Remand Determination").  *See* 68 Fed. Reg.

58,710 (Oct. 10, 2003).  The Labor Department has now certified the Workers as eligible to apply

for benefits – albeit almost four years after their initial application.  Moreover, significantly, that

certification is based *not* on any newly-discovered information but, instead, on the Labor

Department's belated identification of an error that it committed *in February 2000* (when it denied

the Workers' initial TAA petition).

Because it is a correction of the Labor Department's error in reviewing the Workers' TAA
petition, the certification at bar is under the general TAA statute, rather than the NAFTA transitional
adjustment assistance ("NAFTA-TAA") statute.[4]  Specifically, the Labor Department has certified
that:

> All workers of Chevron Products Company, Roosevelt, Utah, who became totally or
> partially separated from employment on or after January 4, 1999, through two years
> from the date of certification, are eligible to apply for adjustment assistance under
> Section 223 of the Trade Act of 1974.

68 Fed. Reg. 58,710 (Oct. 10, 2003).[5]  The Workers have advised that they are satisfied with that

---

[3]Except as otherwise expressly noted, statutory citations in this opinion are to the 1994
version of the U.S. Code.  However, the pertinent text of the cited provisions remained the same at
all times relevant herein.

[4]*Compare* 19 U.S.C. § 2271 *et seq*. *with* 19 U.S.C. § 2331 .

[5]The Government has confirmed that this certification covers not only gaugers, but all
affected employees of Chevron Products Company (including truck drivers).  *See* Transcript of
Teleconference of Sept. 16, 2003 ("Tr.") at 25-27.

certification.  *See* Letter to Court from Counsel for Plaintiffs (Sept. 26, 2003).  Accordingly, with

the observations and clarifications that follow, the Labor Department's Corrected Final Remand

Determination in this matter is sustained.

## I.  Background

### A.  The Trade Adjustment Assistance Laws

Chevron I included a brief overview of the United States' trade adjustment assistance laws,

which are generally designed to address jobs lost due to increased international trade.  *See generally*

Chevron I, 26 CIT at ____, 245 F. Supp. 2d at 1317-18, and authorities cited there.  Worker benefits

available under the program established by the Trade Act of 1974 ("the TAA program") – including

employment services, appropriate training, job search and relocation allowances, and income support

payments – are denominated "*trade* adjustment assistance" ("TAA benefits"), while those available

under the NAFTA Implementation Act, including the related Statement of Administrative Action

("the NAFTA-TAA program"), are referred to as "*transitional* adjustment assistance" ("NAFTA-

TAA benefits").  *Id*.  However, the two programs are very similar.  For the sake of convenience, both

are generally referred to herein as "trade adjustment assistance," except as otherwise specifically

noted.[6]

_____

Similarly, the Government has confirmed that, as the phrase is used in the text of the
certification in the Corrected Final Remand Determination, the "date of certification" is September
25, 2003.  *See* Letter to Court from Counsel for Defendant (Oct. 1, 2003).

[6]*See generally* Former Employees of Chevron Products Co. v. U.S. Sec'y of Labor, 27 CIT
____, ____ n.2, 279 F. Supp. 2d 1342, 1344 n.2 (2003) ("Chevron II") (comparing TAA and NAFTA
programs).  *See also* Tr. at 27-28 (counsel for the Government explains that there is no significant
difference in the benefits available under the TAA statute versus the NAFTA-TAA statute).

As Chevron I explained, the trade adjustment assistance laws are remedial legislation and, as such, are to be construed broadly to effectuate their intended purpose. Chevron I, 26 CIT at ____, 245 F. Supp. 2d at 1318 (citations omitted). Further, both "because of the *ex parte* nature of the certification process, and the remedial purpose of [the statutes], the [Labor Department] is obliged to conduct [its] investigation with the utmost regard for the interests of the petitioning workers." Stidham v. U.S. Dep't of Labor, 11 CIT 548, 551, 669 F. Supp. 432, 435 (*citing* Abbott v. Donovan, 7 CIT 323, 327-28, 588 F. Supp. 1438, 1442 (1984) (quotations omitted) ).

Thus, while the Labor Department is vested with considerable discretion in the conduct of its investigation of trade adjustment assistance claims, "there exists a threshold requirement of reasonable inquiry." Former Employees of Hawkins Oil and Gas, Inc. v. U.S. Sec'y of Labor, 17 CIT 126, 130, 814 F. Supp. 1111, 1115 (1993). Courts have not hesitated to set aside agency determinations which are the product of perfunctory investigations. *See generally* Former Employees of Ameriphone, Inc. v. United States, 2003 Ct. Intl. Trade LEXIS 135, at *5 (Oct. 24, 2003), 27 CIT ____, ____, ____ F. Supp. 2d ____, ____ (2003), and cases cited there.

B.  The History of This Case

As Chevron II noted, this case quickly took on a life of its own. By the time that opinion issued, remanding the action to the Labor Department yet again, the agency already had been accorded no fewer than seven "bites at the apple." Chevron II, 27 CIT at ____, 279 F. Supp. 2d at 1344-45.

―――――――――――――――――

Congress recently consolidated the TAA and NAFTA-TAA programs into a new, expanded benefits program under the Trade Act of 2002. *See* Pub. L. No. 107-210, § 113, 116 Stat. 933, 937 (2002).

As explained in Chevron II, the Labor Department's first two "bites" involved the agency's consideration of the Workers' initial petition for benefits under the TAA statute – the statute under which they have now been certified. 27 CIT at ____, 279 F. Supp. 2d at 1345-46. As set forth in section I.B.3 below, the Workers filed their petition for NAFTA-TAA benefits – the petition directly at issue in this action – only *after* their TAA petition was denied. *See generally* Chevron II, 27 CIT at ____, 279 F. Supp. 2d at 1346.

### 1. The TAA Petition

Following their termination by CPDS on October 31, 1999, the Workers promptly filed a TAA petition with the Labor Department. AR 4. Just a few weeks later, on November 24, 1999, the agency notified them that, in fact, they were already eligible for TAA benefits, under petition TA-W-36,295 filed previously by former employees of another Chevron entity – Chevron USA Production Company ("CPDN") – which had been granted in July 1999. *See* AR 4, 5; 64 Fed. Reg. 43,722, 43,724 (Aug. 11, 1999); *see also* 64 Fed. Reg. 61,940 (Nov. 15, 1999).

However, when officials at the Utah Department of Workforce Services began to make plans to proceed with training for the Workers, they discovered that the men's names did not appear on the list of those eligible for benefits. *See* AR 4. Upon further inquiry, CPDN representatives told the state officials that – as former employees of CPDS – the Workers here "should not be covered under the [pre-existing CPDN] certification." AR 5; *see also* Memo to U.S. Department of Labor Office of Trade Adjustment Assistance from State of Utah Department of Workforce Services, re: NAFTA-TAA Petition Preliminary State Investigation (April 6, 2000) (referring to "attached letter dated January 4, 2000, in which Ms. Alice Edman, TRA Coordinator explains that the Trade Act

Petition for Chevron U.S.A. Production Company (CPDN), #TA-W 36,295 (I-Utah) does not cover the worker[s] from CPDS").

## 2. The Resubmitted TAA Petition

Utah state officials resubmitted the Workers' original TAA petition to the Labor Department in early January 2000, noting CPDN's claim that the Workers here were not covered by the pre-existing CPDN certification, and requesting that the Labor Department "confirm" the scope of that certification. The state officials further requested that – if the Labor Department concluded that the Workers in fact were not covered by the pre-existing certification – the agency consider the Workers' TAA petition "either as a new petition or . . . as an amendment to the . . . [pre-existing] certification." *See* AR 5.

Despite the State's express request, the Labor Department failed to review the scope of the CPDN certification, to confirm whether or not the Workers were covered by it. *See* Tr. at 12-13. Instead, the agency proceeded to initiate a new TAA investigation, designated TA-W-37,240. As discussed in Chevron II, that investigation consisted largely of sending the three-page standard form TAA "Business Confidential Data Request" questionnaire to CPDS, the Workers' former employer. Based solely on CPDS's responses to the questionnaire, the Labor Department denied the Workers' TAA petition on the ground that their work did not constitute "production" under the statute. *See* Chevron II, 27 CIT at ____, 279 F. Supp. 2d at 1345-46; 65 Fed. Reg. 14,626 (March 17, 2000); AR 16-17.[7]

---

[7]The Workers subsequently sought administrative reconsideration of the denial of their TAA petition. That request, too, was denied. *See* 65 Fed. Reg. 19,387 (April 11, 2000).

### 3.  The NAFTA-TAA Petition

While assisting the Workers with their appeal of the Labor Department's denial of the TAA petition, the Utah state officials learned for the first time "that Chevron had been buying Canadian oil."  AR 4.  In light of the Canadian imports, a new petition was filed – this time seeking NAFTA-TAA benefits.  AR 1-5.

However, with no further investigation whatsoever, relying exclusively on its file on the TAA petition, the Labor Department denied the Workers' NAFTA-TAA petition, which had been designated NAFTA-3854.  Chevron II, 27 CIT at ____, 279 F. Supp. 2d at 1346-47; 65 Fed. Reg. 30,442, 30,444 (May 11, 2000); AR 18-19, 24-28.  It is that denial of the Workers' NAFTA-TAA petition which directly gave rise to this action.

### 4.  Subsequent Proceedings

Chevron II chronicles the proceedings that followed.  The Labor Department's additional five "bites at the apple" included the Workers' application for administrative reconsideration of their NAFTA-TAA petition, which the agency denied; the filing of this action and the extensions of time which the agency was granted to, *inter alia*, decide whether to request a voluntary remand or reach some kind of settlement (neither of which materialized); the issuance of Chevron I, a fairly scathing critique of the Labor Department's investigation and analyses to that point, culminating in a remand to the agency with specific instructions for further investigation and analysis; the extension of time granted to the Government for "additional investigation" prior to the filing of the remand results (an

extension which, under the circumstances, amounted to a *de facto* voluntary remand); and, ultimately, the Labor Department's negative determination on remand, reaffirming the agency's determination that the Workers failed to qualify for benefits. *See generally* Chevron II, 27 CIT at ____, 279 F. Supp. 2d at 1347-49.

### 5. *Chevron II*, the Second Remand, and the Eventual Certification

Based on the administrative record as it then existed, and relying heavily on a recent decision in another trade adjustment assistance case involving gaugers, Chevron II rejected the Labor Department's determination on remand and concluded that the Workers here in fact were engaged in "production." 27 CIT at ____, 279 F. Supp. 2d at 1353-55 (*citing* Marathon Ashland, 27 CIT ____, 277 F. Supp. 2d 1298 (2003) ). Chevron II nevertheless gave the Labor Department one final "bite at the apple," ordering a second remand and instructing the agency to further investigate and make a determination as to whether imports of crude oil contributed importantly to the Workers' termination and, if so, "under which statute [TAA or NAFTA-TAA] certification would be warranted" (*i.e.*, whether the relevant imports were from NAFTA countries, or elsewhere in the world), and reserving judgment on the Workers' alternative claims to benefits as "support service workers" and as "secondarily-affected workers." The results of that second remand were to be filed with the Court no later than September 2, 2003. 27 CIT at ____, 279 F. Supp. 2d at 1356-57.

Under cover of a letter dated September 3, 2003, the Labor Department submitted its "Notice of Revised Determination on Reopening," which referenced the docket number of the Workers' TAA petition (TA-W-37,240) – rather than the docket number of their NAFTA-TAA petition (NAFTA-3854) – and certified the Workers as eligible to apply for TAA benefits (rather than NAFTA-TAA

benefits) based on the agency's determination that the Workers are (were) indeed covered by the pre-existing CPDN certification, issued in July 1999. *See* Notice of Revised Determination on Reopening (Sept. 2, 2003); 68 Fed. Reg. 54,491 (Sept. 17, 2003).[8] *See also* 68 Fed. Reg. 58,710 (Oct. 10, 2003).

Although the September 2, 2003 notice accurately stated that Chevron II ordered the Labor Department to investigate, on remand, "whether the workers lost their jobs because of increased imports," the notice gave no indication that the agency in fact had further investigated that issue. Even more perplexing, the notice indicated that the agency's investigation on remand had included "additional investigation about whether [the Workers here] were production workers" – an issue which had already been definitively resolved in Chevron II and thus had not been remanded to the agency.[9] Most importantly, the notice offered no explanation for the timing or rationale of the Labor Department's "about-face" on the coverage of the Workers here under the July 1999 CPDN certification. *See* Notice of Revised Determination on Reopening (Sept. 2, 2003). *See also* 68 Fed. Reg. 58,710 (Oct. 10, 2003).

A September 9, 2003 letter to the parties sought clarification of these and other matters, which were the subject of a subsequent teleconference. *See* Letter to Counsel from Court (Sept. 9,

---

[8]The September 17, 2003 Federal Register notice inadvertently omitted in its entirety the text of page two of the four-page Notice of Revised Determination on Reopening, dated September 2, 2003. *Compare* Notice of Revised Determination on Reopening (Sept. 2, 2003) *with* 68 Fed. Reg. 54,491 (Sept. 17, 2003).

[9]Similarly, the notice stated that Chevron II ordered the Labor Department to consider, on remand, whether the Workers qualified for benefits as secondarily-affected workers. *See* Notice of Revised Determination on Reopening (Sept. 2, 2003); *see also* 68 Fed. Reg. 58,710 (Oct. 10, 2003). But, in fact, Chevron II never reached that issue.

2003); Transcript of Teleconference of Sept. 16, 2003. Following that teleconference and further

internal consultation and review, the Labor Department issued the Corrected Final Remand

Determination, reflecting various clarifications of and corrections to its September 2, 2003 notice.[10]

_____

[10]The Corrected Final Remand Determination revises the September 2, 2003 notice in two substantive respects.

First, the Corrected Final Remand Determination clarifies the relationships among the various related corporate entities. Specifically, the September 2, 2003 notice indicated that "Chevron Products Company, Roosevelt, Utah is a wholly owned subsidiary of Chevron USA Production Company" and that the Labor Department therefore considered that "the workers' firm [was] actually Chevron USA Production Company." *See* Notice of Revised Determination on Reopening (Sept. 2, 2003). The Corrected Final Remand Determination replaced that quoted text with the statement that "Chevron Products Company, Roosevelt, Utah is affiliated with Chevron USA Production Company (as both are wholly owned subsidiaries of Chevron USA, Inc.)." *See* Tr. at 4-5; 68 Fed. Reg. 58,710 (Oct. 10, 2003). The Corrected Final Remand Determination thus makes it clear that Chevron Products Company in fact is not a wholly owned subsidiary of Chevron USA Production Company. Instead, both Chevron Products Company and Chevron USA Production Company are wholly owned subsidiaries of Chevron USA, Inc.

(It is worth noting that, in two separate places, the Corrected Final Remand Determination characterizes Chevron Products Company and Chevron USA Production Company as "affiliates" of one another. But, in a third place, that same determination states the Labor Department's finding that "Chevron Products is an *appropriate subdivision* of *Chevron USA*." 68 Fed. Reg. 58, 710 (Oct. 10, 2003) (emphasis added). It is not entirely clear, in this last context, whether the Labor Department's reference to "Chevron USA" is shorthand for "Chevron USA Production Company" (CPDS's "sister" subsidiary) or for "Chevron USA, Inc." (CPDS's parent company). *See* Tr. at 8-9. It is thus not clear whether the Labor Department is here treating one subsidiary as an "appropriate subdivision" of the other for purposes of the agency's analyses.)

The second substantive difference between the September 2, 2003 notice and the Corrected Final Remand Determination concerns the rationale underlying the Labor Department's assertion that the characterization of the Workers here as "production workers" or "service workers" was mooted by the agency's determination that they are eligible for benefits under the pre-existing July 1999 certification. Specifically, the September 2, 2003 notice asserted that, "[s]ince the workers were a part of a firm which produces an article, crude oil, . . . the characterization of the workers as production or service workers becomes irrelevant *because that distinction only arises in cases where the workers are employed by separate firms*." Notice of Revised Determination on Reopening (Sept. 2, 2003) (emphasis added). In the Corrected Final Remand Determination, that statement is further

*See* 68 Fed. Reg. 58,710 (Oct. 10, 2003). As that notice explains, the Labor Department's

certification of the Workers here is predicated on the relationship between CPDS and CPDN, and

on the fact of CPDN's pre-existing certification:

> [B]ecause Chevron Products Company . . . is affiliated with Chevron USA Production Company (as both are wholly owned subsidiaries of Chevron USA, Inc.) . . . [,] the two firms [Chevron Products Company (CPDS) and Chevron USA Production Company (CPDN)] constituted an integrated production process, the final products of which are crude oil and natural gas.

> The [Labor] Department, on July 6, 1999, issued a certification of eligibility for workers of Chevron USA Production Company in Utah, to apply for trade adjustment assistance (TA-W-36,295). That certification was supported by increased imports of crude oil in January-March 1999 compared to the same time period of 1998. Therefore, the Department certifies the Chevron Products, Roosevelt, Utah, workers as eligible for assistance under TAA.

*Id*.

## II. Analysis

While the Workers here are no doubt gratified that they have at long last prevailed on their

claim for benefits, they are also – quite understandably – frustrated that it has taken the Labor

Department nearly four years to grant them the relief to which they are entitled. *See* Tr. at 3-4.

As Chevron I noted, "[w]here, as here, 'the company under investigation is part of a larger

corporate entity,' " Linden Apparel imposes upon the Labor Department " 'a duty of providing a

description of the [company's] organizational structure and of inquiring into how the subject

---

qualified by the addition of the phrase "or there are subdivisions within the firm that produce articles that are separately identifiable" at the end of the sentence. 68 Fed. Reg. 58,710 (Oct. 10, 2003). *See also* Letter to Counsel from Court (Sept. 9, 2003) at ¶ 5; Tr. at 23-25. The Corrected Final Remand Determination thus refined the September 2, 2003 notice, to more accurately state existing law by reflecting Abbott v. Donovan, 6 CIT 92, 570 F. Supp. 41 (1983) and its progeny.

company fits into the organization.' " <u>Chevron I</u>, 26 CIT at ____ n.14, 245 F. Supp. 2d at 1328 n.14 (*quoting* <u>Former Employees of Linden Apparel Corp. v. United States</u>, 13 CIT 467, 470, 715 F. Supp. 378, 381 (1989) ).[11] The record in this action evidences the Labor Department's abject failure to fulfill that obligation.

The record reveals that, over the course of the years that have passed since the Workers' termination by CPDS, the Labor Department has been repeatedly reminded of the existence of entities related to CPDS (including CPDN and Chevron USA, Inc.); the Labor Department has been repeatedly reminded of both (a) the TAA petition filed by the Workers at issue here, and (b) the Labor Department's pre-existing certification of the workers at CPDN; and the Labor Department has been repeatedly reminded of its obligations under <u>Linden Apparel</u> to investigate the structure and interrelationships of the various Chevron entities and, moreover, has been explicitly instructed to consider the agency's findings and determinations in TAA and NAFTA-TAA investigations concerning other related Chevron entities.

Indeed, it was the Labor Department itself that first made the connection between the pre-existing certification of the CPDN workers and the Workers at issue here. As discussed above, the Labor Department initially advised the Workers here that they were covered by the CPDN certification in late November 1999, when the Workers had been out of work for less than one month. *See* AR 5 (noting that, on November 24, 1999, the Labor Department advised the Workers

---

[11]*Accord* <u>Former Employees of Carhartt, Inc. v. Chao</u>, 2001 Ct. Intl. Trade LEXIS 77, at *18 (June 13, 2001), 25 CIT ____, ____ n.8, ____ F. Supp. 2d ____, ____ n.8 (2001) (*quoting* <u>Linden Apparel</u>); <u>Former Employees of Champion Aviation Prods. v. Herman</u>, 1999 Ct. Intl. Trade LEXIS 44, at **13 (June 4, 1999), 23 CIT 349, 353 (same).

that they were covered by the CPDN certification). And the Government concedes that, as a result of the January 4, 2000 letter to the Labor Department from Utah state officials (which, *inter alia*, requested that the agency "confirm" the scope of the pre-existing CPDN certification *vis-a-vis* the Workers here), the Labor Department was on notice of the relationships among CPDS, CPDN and Chevron USA, Inc. at least as of that date. *See* Tr. at 6; AR 5 (Utah state officials' letter of January 4, 2000 to Labor Department, referring to CPDN as "A Division of Chevron U.S.A., Inc." and to CPDS as "a separate entity of Chevron U.S.A., Inc.").[12]

Notwithstanding the state officials' express request and the Labor Department's independent obligation under Linden Apparel to investigate the structure and organization of interrelated corporate entities, and notwithstanding the information provided to the agency concerning the relationship between CPDN and CPDS, it appears that the Labor Department simply "dropped the ball," abandoning – with no further review – its November 1999 determination that the Workers here were covered by the pre-existing CPDN certification. Tr. at 13, 18-19. In any event, neither the Labor Department's denial of the Workers' resubmitted TAA petition nor the agency's determination declining reconsideration of that denial made any reference to the relationship between CPDS and CPDN, or to the pre-existing CPDN certification. AR 16-17; 65 Fed. Reg. 19,387 (April 11, 2000).[13]

---

[12]In the course of the Labor Department's investigation of the Workers' resubmitted TAA petition, a representative of CPDS advised the Labor Department, in no uncertain terms, that CPDS was "a division of Chevron U.S.A. Inc." CAR 13.

[13]It is not possible to reconstruct with precision the entire chain of events surrounding the Labor Department's handling of the Workers' TAA petition, because – although the agency ultimately certified the Workers under that petition (rather than their NAFTA-TAA petition) – the administrative record of the TAA investigation was never filed in this action. It is therefore impossible to tell from this record whether, for example, the Workers' TAA petition, or their request

A few months later, the Workers once again alerted the Labor Department to the pre-existing CPDN certification, and to the relationship between CPDS and CPDN. In late May 2000, the Workers sought administrative reconsideration of their petitions for TAA and NAFTA-TAA, specifically citing the pre-existing CPDN certification ("TA-W 36, 295 (I-Utah)"). *See* AR 29-30; AR 32 (noting that Workers' undated request for reconsideration was transmitted on May 25, 2000). The Labor Department's subsequent determination denying reconsideration expressly acknowledged the CPDN certification. But the agency apparently gave it short shrift, and failed to consider any implications of that certification for the Workers here. Yet again, the Labor Department simply failed to "put two and two together." *See* AR 32; 65 Fed. Reg. 46,988 (Aug. 1, 2000) ("With respect to TA-W-36,295I, the petition is a certification issued on July 6, 1999, applicable to workers of Chevron Production, Chevron USA, Inc., all locations in Utah. Since the petitioners in this case [the Workers at issue here] are not employees of that company [CPDN], there is no basis to reexamine the findings of that investigation.").

Documents appended to the Workers' Complaint filed in this action again should have alerted the Labor Department to both the pre-existing certification of CPDN, and the relationship between CPDN and CPDS as "sister" subsidiaries of Chevron USA, Inc. One attachment was a chronology of events in the administrative proceedings, which noted that – in late November 1999 – the Workers here had "received notice back from DOL [the Labor Department] that they were covered under *petition TA-W-36,295* [the pre-existing CPDN certification]," but that it was later

---

for reconsideration of the denial of that petition, made any reference to the relationship between CPDN and CPDS, or to the pre-existing CPDN certification.

discovered that CPDN was "*a different subsidiary*" than CPDS.  *See* Memo to Barbara Vail from Tracy Parrish (July 12, 2000) (emphasis added) (appended to Complaint).  A second attachment – the State of Utah's Findings and Recommendations on the Workers' NAFTA-TAA petition  – similarly noted the fact of the pre-existing CPDN certification, and set forth the State's finding that "[t]he Chevron Oil company has *several subsidiary units* that have been impacted [by imports of oil] as evidenced by *approved petition #TA-W 36,295 (I-Utah)* for Chevron U.S.A. Production Company (CPDN)."  *See* Memo to Labor Department from Utah Department of Workforce Services re: NAFTA-TAA Petition Preliminary State Investigation (April 6, 2000) (emphasis added) (appended to Complaint).

The Workers even included as Exhibit 1 to their opening brief in this action an actual copy of the Labor Department's pre-existing certification of CPDN.  *See* Memorandum in Support of Plaintiffs' Motion for Judgment on the Agency Record ("Pls.' Initial Brief"), Exh. 1 (64 Fed. Reg. 61,940-41 (Nov. 15, 1999), in TA-W-36,295).  That same brief, filed in June 2001, summarized the history of the case, and – in the space of a single page – highlighted the Labor Department's initial notification to the Workers of their coverage under the pre-existing CPDN certification, and also noted that both CPDN and CPDS were "related" divisions of the same parent company – Chevron USA, Inc.  *See* Pls.' Initial Brief at 5.[14]  Elsewhere, the brief asserted that the Labor Department's failure to certify the Workers here was "grossly inconsistent with DOL's prior decisions regarding

---

[14]Statements in the Workers' initial reply brief were to the same effect.  *See* Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiffs' Motion for Judgment on the Agency Record at 2 (reiterating that the plaintiff Workers "are former employees of [CPDS], which is a subsidiary of Chevron U.S.A., Inc.").

Chevron U.S.A. workers," citing as one example the pre-existing CPDN certification. *See* Pls.'
Initial Brief at 7.

Still the Labor Department failed to "connect the dots." Indeed, incredibly, the
Government's response brief summarily dismissed Plaintiffs' Exhibit 1 – the copy of the pre-existing
CPDN certification – as "inapposite," and urged that it be stricken from the record. *See* Defendant's
Response in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record at 18-19, 21-
22.

The Government now candidly concedes that the Labor Department was on notice of the
relationships among CPDS, CPDN and Chevron USA, Inc. at least as early as January 2000, but
simply failed to "appreciate the shared parentage" of CPDS and CPDN until the Court's most recent
remand, in Chevron II. Tr. at 6. While the Government's candor is to be commended, the Labor
Department's claims of ignorance are difficult to accept.

Even if the Labor Department in fact somehow managed to overlook the multiple references
to its pre-existing certification of CPDN and to the relationships among CPDS, CPDN and Chevron
USA, Inc. throughout the course of the administrative proceedings (as summarized above), the
agency's mandate in response to the remand in Chevron I could hardly have been more pointed. *See
generally* Chevron I, 26 CIT ____, 245 F. Supp. 2d 1312. Referring generally to the pre-existing
CPDN certification (26 CIT at ____ n.5, 245 F. Supp. 2d at 1320 n.5), noting that the plaintiff
Workers' former employer – CPDS – "is a subsidiary of Chevron U.S.A., Inc." (26 CIT at ____ n.10,
245 F. Supp. 2d at 1326 n.10), and emphasizing the Labor Department's affirmative obligation under
Linden Apparel to investigate the interrelationships among relevant corporate entities (26 CIT at

____ n.14, 245 F. Supp. 2d at 1328 n.14), <u>Chevron I</u> remanded this action to the Labor Department with instructions to "conduct a thorough investigation of the duties of the [Workers], *in the context of the oil production scheme of CPDS-related entities*." 26 CIT at ____, 245 F. Supp. 2d at 1328 (emphasis added). Elsewhere, <u>Chevron I</u> emphasized the Labor Department's need to consider "the organizational structure of CPDS and related corporate entities." 26 CIT at ____ n.16, 245 F. Supp. 2d at 1329 n.16. And, discussing the potential significance of the pre-existing CPDN certification, <u>Chevron I</u> expressly directed that – on remand – the Labor Department consider "the findings and determinations of the Labor Department *in any relevant [TAA or NAFTA-TAA] investigations concerning other related Chevron entities*." 26 CIT at ____ n.23, 245 F. Supp. 2d at 1333 n.23 (emphasis added). In light of all these circumstances, the Labor Department's claimed ignorance of the relationship between CPDN and CPDS, and of the significance of the pre-existing CPDN certification, simply strains credulity.

In sum, the record in this action evidences not only the Labor Department's dereliction of duty under <u>Linden Apparel</u>, but – even more fundamentally – its failure to fulfill its overarching obligations to "marshal all relevant facts to make a determination" in trade adjustment assistance cases, and to "conduct [its] investigation with the utmost regard for the interests of the petitioning workers." 29 C.F.R. § 90.12 (1999); <u>Stidham</u>, 11 CIT at 551, 669 F. Supp. at 435 (citation omitted).

In a word, this case stands as a monument to the flaws and dysfunctions in the Labor Department's administration of the nation's trade adjustment assistance laws – for, while it may be an extreme case, it is regrettably not an isolated one. The relatively high number of requests for voluntary remands in trade adjustment assistance cases appealed to this Court speaks volumes about

the calibre of the Labor Department's investigations in general, and the Government's ability to

defend them. *See generally* Ameriphone, 2003 Ct. Intl. Trade LEXIS 135, at *15-*17, 27 CIT at

____, ____ F. Supp. 2d at ____. Similarly telling is the growing line of precedent involving court-

ordered certifications of workers, evidencing the bench's mounting frustration with the Labor

Department's handling of these cases.[15] Clearly, there is a message here. Only time will tell whether

the Labor Department, and Congress, are listening.

Much ink has been spilt on this case over the past four years. Needless to say, a proper and

thorough initial investigation would have spared all parties – including the Labor Department, as

well as the Justice Department, the Workers, their counsel, and the Court – untold hours of work.

---

[15]*See*, *e.g.*, Former Employees of Pittsburgh Logistics Systems, Inc. v. U.S. Sec'y of Labor, 2003 Ct. Intl. Trade LEXIS 111, *17, *45 (Aug. 28, 2003), 27 CIT ___, ___, ___ (concluding that, after "five bites at the apple," "further remand [to the Labor Department] would be futile," and ordering the agency to certify the workers for trade adjustment assistance); Marathon Ashland, 27 CIT at ____, 277 F. Supp. 2d at 1312-13 (mandating that the Labor Department certify workers for trade adjustment assistance, observing that "[the Department of] Labor's and the company's inability or unwillingness to answer with any specificity the questions necessary . . . to evaluate the legitimacy of Plaintiffs' claim place the court in a difficult position," and concluding that "[n]othing in the record indicates that [the Department of] Labor has the resources or willingness to conduct an investigation beyond making inquiries of [the company]"), *appeal docketed*, No. 03-1556 (Fed. Cir. Aug. 18, 2003); Former Employees of Barry Callebaut v. Herman, 26 CIT ____, ____, 240 F. Supp. 2d 1214, 1227-28 (2002) (instructing the Labor Department to certify workers for TAA and NAFTA-TAA benefits, holding that "[the Department of] Labor's inadequate efforts have failed to produce a determination that meets minimum legal standards. Having failed to conduct an adequate investigation after four opportunities, [the Department of] Labor will not receive another."), *appeal docketed*, No. 03-1113 (Fed. Cir. Nov. 27, 2002).

*See also* Former Employees of Tyco Elecs. v. U.S. Dep't of Labor, 27 CIT ____, ____, 264 F. Supp. 2d 1322, 1329-30 (2003) (discussing additional cases in which court's frustration with the Labor Department's unwillingness or inability to comply with remand orders resulted in court-ordered certifications); Tyco Elecs., 27 CIT ____, ____, 259 F. Supp. 2d 1246, 1248 (2003) (although remand results were required to be filed on October 7, 2002, the Labor Department still had not even begun the remand investigation more than a month after that date).

But, most significantly, the acts and omissions of the Labor Department deprived the Workers of the timely relief to which they were entitled.

This is not a case of "better late than never." The record here – perhaps mercifully – does not reveal the current employment status of these Workers, or how (and with what success) the men have endeavored to support themselves and their families in the years since their termination by CPDS. But, as a general principle, the effectiveness of trade adjustment assistance depends upon its timeliness; and the effectiveness cannot be measured in dollars alone.

There is a very human face on these cases. Workers who are entitled to trade adjustment assistance benefits but fail to receive them may lose months, or even years, of their lives.[16] And the devastating personal toll of unemployment is well-documented. Anxiety and depression may set in, with the loss of self-esteem, and the stress and strain of financial pressures. Some may seek refuge in drugs or alcohol; and domestic violence is, unfortunately, all too common. The health of family members is compromised with the cancellation of health insurance; prescriptions go unfilled, and medical and dental tests and treatments must be deferred (sometimes with life-altering consequences). And college funds are drained, then homes are lost, as mortgages go unpaid. Often, marriages founder.

As explained in Int'l Union v. Marshall, the enactment of the trade adjustment assistance provisions of the Trade Act of 1974 reflected Congress' recognition "that fairness demanded some mechanism whereby the national public, which realizes an overall gain through trade readjustments,

---

[16]As Marathon Ashland put it, "TAA cases are different from most litigation before this court. This is not a situation, such as in customs or antidumping duty cases, where a bond can be posted to cover anticipated cost and reduce liability." 27 CIT at ____, 277 F. Supp. 2d at 1313.

can compensate the particular . . . workers who suffer a loss much as the doctrine of eminent domain requires compensation when private property is taken for public use.  Otherwise the costs of a federal policy [of free trade] that conferred benefits on the nation as a whole would be imposed on a minority of American workers . . . ."  Int'l Union v. Marshall, 584 F.2d 390, 395 (D.C. Cir. 1978) (citations omitted).[17]

Those same concerns are at least as real today as they were 25 years ago.  Making the case for trade adjustment assistance, one leading senator recently noted:

> No nation is better suited or better prepared to benefit from global trade [than the United States].  We have the best-educated workers and most productive workforce in the world, the most mature economy, the most developed infrastructure.  We are in a position to seize the high-skill, high-wage jobs generated by open global markets, so long as we don't turn our backs on them.
>
> Just as we can't turn our backs on trade, we can't turn our backs on the hard-working American families who have had their lives ruined by the impersonal forces of trade.
>
> It can be devastating to a family when a parent loses his or her job because a factory closes down or moves away.  That devastation can turn to real fear if losing that job means losing health insurance.
>
> The reality is that the jobs we gain from trade do nothing to compensate the men and women who have lost their jobs because of trade.

148 Cong. Rec. S7,828 (daily ed. Aug. 1, 2002) (statement of Sen. Daschle).

And the Administration, too, has pledged its renewed "commit[ment] to assisting workers whose jobs are threatened by or lost to international competition[, to] acquire the skills necessary to compete in the new economy."  White House Fact Sheet, "What is Trade Adjustment

---

[17]The same concerns drove enactment of the transitional adjustment assistance provisions of the NAFTA Implementation Act.  See generally Chevron I, 26 CIT at ____, 245 F. Supp. 2d at 1317-18 (summarizing history, purpose and intent of NAFTA-TAA program).

Assistance?", *available at* http://www.whitehouse.gov/infocus/internationaltrade/taapager.html.

Trade adjustment assistance programs thus historically have been, and today continue to be, touted as the *quid pro quo* for policies of free trade. But Congress and the Labor Department break faith with American workers if trade adjustment assistance programs are not adequately funded and conscientiously administered.[18] As the Chairman of the Senate Finance Committee has sagely cautioned, "[A]n honest, responsible program to address the needs of workers . . . who lose their jobs because of trade is perhaps the most important element of a politically viable program to expand trade. If it is ignored, efforts at trade liberalization will ultimately fail." Sen. Max Baucus, Chairman, Senate Finance Committee, Keynote Address, "Trade Policy in 2002," Institute for International Economics, Washington, D.C. (Feb. 26, 2002).

### III. Conclusion

Whether as a result of overwork, incompetence, or indifference (or some combination of the three), the Labor Department – for almost four years – deprived the Workers here of the job training and other benefits to which they are entitled. Now, finally, the agency has certified them as eligible

---

[18]In light of the current state of the economy, the Labor Department is likely inundated with trade adjustment assistance claims. But, as Ameriphone noted:

> [I]f the agency's resources are not adequate to enable it to meet its statutory mandate, the remedy lies with Congress. The volume of claims filed with the agency cannot serve to excuse it from fulfilling its legal obligations *vis-a-vis* the legions of displaced workers. Indeed, if anything, the volume of claims filed serves to underscore the vital nature of the agency's mission.

2003 Ct. Intl. Trade LEXIS 135, at *16, 27 CIT at ____, _____ F. Supp. 2d at _____.

to apply for trade adjustment assistance; and the Workers have advised that they are satisfied with that certification.  The Corrected Final Remand Determination in this matter is therefore sustained. *See* 68 Fed. Reg. 58,710 (Oct. 10, 2003).

    Judgment will enter accordingly.

                                      /S/        Delissa A. Ridgway
                                                  Judge

Decided:   December 30, 2003
                 New York, New York