**Slip Op. 08-140**

## UNITED STATES COURT OF INTERNATIONAL TRADE

---

FORMER EMPLOYEES OF ELECTRIC　　　　:
　MOBILITY CORPORATION,

　　　　　　　　　　　　　　　　　:

　　　　　　　　*Plaintiffs*,

　　　　　　　　　　　　　　　　　:

　　　　　v.　　　　　　　　　　　　　　Court No. 08-00079

　　　　　　　　　　　　　　　　　:

U. S. SECRETARY OF LABOR,

　　　　　　　　　　　　　　　　　:

　　　　　　　　*Defendant*.

---

[Revised Determination on Remand, certifying workers as eligible to apply for Trade Adjustment Assistance and Alternative Trade Adjustment Assistance, is sustained.]

Dated:　December 22, 2008

　　　Sidley Austin LLP (Lawrence R. Walders and Rajib Pal), for Plaintiffs.

　　　Gregory G. Katsas, Assistant Attorney General; Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Robert C. Bigler), for Defendant.

## **OPINION**

RIDGWAY, Judge:

　　　In this action, former employees of Sewell, New Jersey-based Electric Mobility Corporation ("the Workers") successfully contested the determination of the U.S. Department of Labor denying their petition for certification of eligibility for trade adjustment assistance ("TAA") and alternative trade adjustment assistance ("ATAA"). *See* 72 Fed. Reg. 58,896, 58,897 (Oct. 17, 2007) (notice of receipt of petition and initiation of investigation); 72 Fed. Reg. 64,245, 64,247 (Nov. 15, 2007) (notice of denial of petition); 73 Fed. Reg. 1897 (Jan. 10, 2008) (notice of negative determination

on reconsideration); A.R. 3A-3C, 31-35, 70, 75-76.[1]  Jurisdiction lies under 28 U.S.C. § 1581(d)(1)

(2000).

Now pending before the Court is the Labor Department's Notice of Revised Determination

On Remand ("Remand Determination"), which certifies that:

> All workers of Electric Mobility Corporation, Sewell, New Jersey, who became
> totally or partially separated from employment on or after February 5, 2007, through
> two years from the issuance of this revised determination, are eligible to apply for
> Trade Adjustment Assistance under section 223 of the Trade Act of 1974, and are
> eligible to apply for alternative trade adjustment assistance under Section 246 of the
> Trade Act of 1974.

73 Fed. Reg. 42,373, 42,374 (July 21, 2008); S.A.R. 45.  As a result of the agency's certification,

eligible former employees of Electric Mobility Corporation may receive benefits including

employment services (such as career counseling, resume-writing and interview skills workshops,

and job referrals), vocational training, job search and relocation allowances, income support

payments, and a health insurance coverage tax credit, as well as a wage insurance program for older

workers.[2]

---

[1]The administrative record in this case consists of two parts – the initial Administrative Record (which the Labor Department filed with the court after this action was commenced), and the Supplemental Administrative Record (which was filed after the Labor Department's post-remand certification of the Workers).

The two parts of the administrative record are separately paginated; both parts include confidential business information.  Citations to the public record are noted as "A.R. ____" and "S.A.R. ____," as appropriate, while citations to the confidential record are noted as "C.A.R. ____" and "C.S.A.R. ____."

[2]*See generally* Former Employees of BMC Software, Inc. v. U.S. Sec'y of Labor, 30 CIT ____, ____ & n.5, 454 F. Supp. 2d 1306, 1309-10 & n.5 (2006) (summarizing benefits available under TAA and ATAA programs) ("BMC I").

The Workers have advised that they are satisfied with the Department of Labor's certification. *See* Comments of Plaintiffs on Redetermination Results Filed by the Department of Labor. Further, as outlined below, a review of the administrative record as a whole reveals that the agency's Remand Determination is supported by substantial evidence, and is otherwise in accordance with law. The Labor Department's Remand Determination certifying the Workers as eligible to apply for trade adjustment assistance and alternative trade adjustment assistance is accordingly sustained.

## I. **Background**

The Workers' former employer, Electric Mobility Corporation ("EMC"), designs and manufactures medical and mobility devices (electric mobile scooters), known as "Rascal scooters," for use by the disabled. A.R. 1; C.A.R. 8.[3] EMC was the subject of a 2005 TAA/ATAA certification prior to the petition at issue here, based on company lay-offs associated with an increase in imports of assembled electric scooters like those produced by EMC. *See* A.R. 5-6 (TAA/ATAA certification of EMC, dated Feb. 4, 2005); 70 Fed. Reg. 11,702, 11,704, 11,707 (March 9, 2005). That certification expired on February 4, 2007. *See* A.R. 5-6 (certifying workers "separated from employment on or after January 14, 2004 through two years from [February 4, 2005,] the date of certification"), 27 (stating that the 2005 certification "expired on February 4, 2007"). The lay-offs at Electric Mobility continued, however, as the company's sales and production declined. A.R. 1, 36-39; C.A.R. 11-12; S.A.R. 42-44; C.S.A.R. 37.

---

[3]EMC is now known as "The Rascal Company." *See* company website at http://www.rascalscooters.com.

The TAA/ATAA petition here at issue was filed on behalf of the Electric Mobility workers who lost their jobs after February 4, 2007, by the TAA Coordinator at the New Jersey Department of Labor and Workforce Development.[4]  A.R. 1-3 (TAA/ATAA petition).  Although the petition itself indicated that lay-offs had continued after February 4, 2007 (when the 2005 TAA/ATAA certification expired), and although the state official who filed the new petition expressly confirmed the fact of the continuing lay-offs in a phone conversation with a Labor Department investigator, the agency nevertheless denied the Workers' petition based on the agency's finding that there had been no decline in employment levels at EMC since the 2005 certification expired.[5]  *See* A.R. 1; C.A.R. 22, 24-28; 72 Fed. Reg. at 64,247.

In denying the petition, the Labor Department relied on information which EMC's Human Resources Generalist provided on the agency's standard Business Confidential Data Request questionnaire, indicating generally that employment had increased, notwithstanding an apparently precipitous decline in sales and production.  *See* C.A.R. 11-12, 21-25.  Indeed, a Labor Department investigator had called the company's Human Resources Generalist, who confirmed that the figures

---

[4]As discussed in greater detail below, the relevant time period for purposes of the Labor Department's analysis of the TAA/ATAA petition at issue here was the one year period preceding the filing of the petition on October 2, 2007.  *See* S.A.R. 43 (identifying "the relevant period" as "October 2, 2006 through October 2, 2007").  However, EMC workers who lost their jobs on or before February 4, 2007 were covered by the 2005 TAA/ATAA certification.

[5]In brief, in a case such as this, workers are eligible for TAA if the Labor Department finds that there have been significant lay-offs (or threats of lay-offs) by their employer; that there has been an absolute decline in the sales and/or production of the firm; that there has been an increase in imports of "articles like or directly competitive with" articles produced by the firm; and that the increase in imports "contributed importantly" to both the lay-offs (or threatened lay-offs) and the decline in sales and/or production.  19 U.S.C. § 2272 (Supp. II 2002); *see generally* BMC I, 30 CIT at ____ n.6, 454 F. Supp. 2d at 1310 n.6 (detailing eligibility requirements for various types of workers).

she had supplied on the agency questionnaire "[were] in fact correct," and that she was "not aware

of any workers that were 'separated' after 2/4/07" (the date on which the 2005 TAA/ATAA

certification expired).  *See* C.A.R. 21-25.

One of the displaced Workers – the company's former Internal Lead Auditor – promptly

requested reconsideration by the Labor Department.  *See* A.R. 36-40, 65-66, 69; 72 Fed. Reg. 67,965

(Dec. 3, 2007) (notice of affirmative determination regarding application for reconsideration).[6]  In

support of reconsideration, the Workers appended to their request a formal notice prepared by EMC

which was "provided to employees at the time of separation" to comply with the company's legal

obligations under employment laws – a three-page listing of employees by position title, including

a list of 15 individuals which the notice expressly identified as "persons whose positions are being

eliminated as a result of Electric Mobility Corporation's May 2007 reduction in force."  A.R. 37-39.

The Workers' request for reconsideration noted that, in fact, one additional position had also been

eliminated, for a total of 16 lay-offs in May 2007.  A.R. 36.

In addition, the Labor Department received a letter from EMC's Human Resources

Generalist, advising that she had made a "clerical error" in the employment data provided to the

agency on the Business Confidential Data Request form.  *See* A.R. 45.  Enclosed with the letter was

a new (assertedly accurate) document captioned "Active Employees 2/5/07 to 10/2/07."  The number

---

[6]The Labor Department's letters giving notice of the agency's denial of the Workers'
TAA/ATAA petition were conspicuously silent on the Workers' right to seek immediate judicial
review of the agency's negative determination, and instead referred only to the process for seeking
administrative reconsideration. A.R. 29-30.  Nor did the Federal Register notice advise the Workers
of their rights.  *See* 72 Fed. Reg. at 64,245-47; *see generally* BMC I, 30 CIT at ____, 454 F. Supp.
2d at 1316-17 (noting that Labor Department letter advising BMC workers of denial of their petition
advised them of process for seeking reconsideration by agency, but "said nothing about [those
workers'] right to challenge the Negative Determination in this court").

of employees' names on that list was some 195 lower than the figure that she had reported on the Business Confidential Data Request form for the period January through September 2007, and some 142 lower than the figure that she had reported for the period January through September 2006. *Compare* C.A.R. 12 *with* A.R. 46-50.

According to a three-sentence "Memo to Files" prepared by a Labor Department investigator documenting a follow-up phone conversation, EMC's Human Resources Generalist confirmed that – contrary to her earlier statements to the agency – in fact "[t]here were 18 people laid off in May of 2007 company-wide." C.A.R. 51. However, the memo further indicates that "the company has been expanding and hiring people for other positions since January of 2007," and that "overall employment has been increasing." *Id.*[7]

The administrative record indicates that the Labor Department investigator also left a message for the Worker who filed the request for reconsideration, but the Worker was unable to "decipher" the phone number left in the message, and was thus unable to return the investigator's phone call. A.R. 52. The Worker therefore sent a letter to the Labor Department requesting that the agency investigator call her again. *Id.* However, the investigator failed to do so.

The Labor Department subsequently issued a Negative Determination on Reconsideration, reaffirming its denial of the Workers' TAA/ATAA petition. A.R. 72-73; 73 Fed. Reg. 1897. The agency conceded "that [EMC] workers were laid off . . . during the relevant time period." *Id.* The agency nevertheless concluded that "overall employment at the subject firm . . . increased from

---

[7]In response to a request from the agency investigator, the Human Resources Generalist subsequently sent the Labor Department a "Head Count as of 2/5/07," as well as a "Head Count as of 10/2/07" (reflecting an apparent increase in the number of employees between February 2007 and October 2007). C.A.R. 54-63.

October 2006 to September 2007." *Id*. According to the Labor Department, because "employment levels at the subject facility did not decline and there was no threat of separations during the relevant period," the criteria for trade adjustment assistance were not satisfied. *Id*.

This action ensued. In their Complaint, the Workers reiterated that – contrary to the Labor Department's findings – employment levels at EMC "have not increased, but have declined over the period of October 2006 to September 2007 and continue to do so." Complaint. Attached to the Complaint was an e-mail message from EMC's lead outside auditor for the International Standards Organization, which stated that EMC's "head count" as of October 30, 2006 was 343, and that the count had since declined to 268 (as of November 2006), and then to 250 (as of May 2007, reflecting, *inter alia*, the lay-offs of 16 personnel that month, as reported in the Workers' request for administrative reconsideration). Complaint, Exh. A. The auditor's message further stated that the count remained at 250 as of October 24, 2007. *Id*.

In lieu of filing an Answer with the court, the Labor Department requested – and was granted – a voluntary remand. The Workers' pro bono counsel promptly dispatched a six-page, single-spaced letter to the agency, painstakingly cataloguing numerous flaws in the agency's investigations and analyses to date, and urging the Labor Department to conduct "a more thorough inquiry" on remand, including "determining the level of employment at EMC as of October 2, 2006 (one year prior to the date of Plaintiffs' petition), and comparing that information to the head count [as] of . . . October 2, 2007." Letter from Counsel for Plaintiffs to Labor Department (June 6, 2008) (C.S.A.R. 18-23) ("Letter from Counsel").

The Labor Department responded by once again contacting EMC's Human Resources Generalist. This time, however, the agency was referred to the company's Director of Human Resources. When the Labor Department investigator inquired why the matter had been "kicked upstairs" to the Director of Human Resources, the Director explained that, at the time the company had received the agency's prior requests for information, the Human Resources Generalist "was still learning the computer system" – and that, indeed, the Director of Human Resources "was still better at using the system than [the Human Resources Generalist]." *See* C.S.A.R. 32.

As discussed in the agency investigator's phone conversation with EMC's Director of Human Resources, the Labor Department followed up with a letter requesting that the company provide "the number of people (full-time, part-time, salary, hourly)" employed at EMC as of October 2, 2006, and the exact same figures for the following year (October 2, 2007). S.A.R. 34. Three days later, the Labor Department had the relevant data in hand. C.S.A.R. 37. As the Workers had insisted all along, the figures showed that total employment at EMC plummeted by more than 25% between October 2006 and October 2007. *Id.* Indeed, employment in all categories dropped significantly, with the exception of part-time employees (which, not surprisingly, reflected a slight increase). *Id.*

In its Notice of Revised Determination on Remand, the Labor Department concluded that – during the relevant period (*i.e.*, the one year period preceding the Workers' October 2, 2007 petition) – EMC's sales and production had declined, that imports of "articles like or directly competitive with medical and mobility devices produced by [EMC]" had increased, and that (contrary to the agency's earlier determinations) employment levels at EMC in fact had declined.

The Labor Department further concluded that a significant number of EMC's workers "are age 50 or over and possess skills that are not easily transferable." Reversing its two prior denials, the Labor Department therefore certified as eligible to apply for both TAA and ATAA "[a]ll workers of Electric Mobility Corporation, Sewell, New Jersey, who became totally or partially separated from employment on or after February 5, 2007" (*i.e.*, following the expiration of the agency's prior certification) for a period of "two years from the issuance of [the Remand Determination]." *See* 73 Fed. Reg. 42,373-74; S.A.R. 39-45.

## II. Analysis

The perfunctory investigation which gave rise to this action bore the hallmarks of many of the other TAA/ATAA investigations that have ended up in court in recent years. For example, here, as in other TAA/ATAA cases, the Labor Department was guilty of over-reliance on employer-provided information, and of discounting – even ignoring – information provided by workers or their representatives. *See generally* Former Employees of BMC Software, Inc. v. U.S. Sec'y of Labor, 30 CIT ____, ____, 454 F. Supp. 2d 1306, 1328-37 (2006) (criticizing agency's routine over-reliance on employer-provided information, and discussing fallacies in agency's apparent assumption that such information is inherently credible and reliable) ("BMC I"). Similarly, here, as in other cases, the agency consistently failed to identify and resolve discrepancies and inconsistencies in the information provided to it. *See generally* BMC I, 30 CIT at ____, 454 F. Supp. 2d at 1324-28 (criticizing agency's recurring failure to identify and resolve discrepancies in information provided to it). These and other methodological flaws infected the Labor Department's

investigation throughout, and prevented the agency from reaching a timely, correct determination on the merits of the Workers' petition.

At the outset, the Labor Department accepted – and, indeed, based its initial determination denying the Workers' petition on – data provided by EMC's Human Resources Generalist which were inherently inconsistent, and absurd on their face. As the Workers' counsel aptly noted, the employment figures for "Jan thru Sept. 2007" provided by EMC in its response to the agency's Business Confidential Data Request "could not be correct": "It makes no sense that production at EMC would *decline* [precipitously] . . . from Jan-Sep 2006 to Jan-Sep 2007, while the number of salaried employees at EMC would *increase* [significantly] . . . over that same period." *See* Letter from Counsel at 5 n.3 (C.S.A.R. 22).

The discrepancy between the employment data and the sales/production data provided by EMC should have immediately sounded alarm bells and triggered giant red flags at the Labor Department. Apparently the discrepancy gave the agency investigator at least *some* pause; as discussed above, she called EMC's Human Resources Generalist to confirm that the employment figures on the agency questionnaire "[were] in fact correct." C.A.R. 21-25.

There is no indication, however, that the Labor Department investigator pressed EMC's Human Resources Generalist to explain the seeming inconsistency in the data – or, indeed, that the agency investigator even drew EMC's attention to the discrepancy. Instead, the agency investigator contented herself with the Human Resources Generalists's broad assurance that the numbers which had been provided were "correct." Nor did the agency investigator directly confront the Human Resources Generalist with the sworn statement of the state TAA Coordinator that – contrary to the

assertions of the Human Resources Generalist – lay-offs at the company had continued after February 4, 2007 (when the 2005 TAA/ATAA certification expired). That kind of "don't ask/don't tell" approach to TAA/ATAA investigations is fundamentally inconsistent with the Labor Department's solemn obligation to "conduct [its] investigation[s] with the utmost regard for the interests of the petitioning workers" and to "marshal all relevant facts" before making its determinations granting or denying workers' petitions. *See* Stidham v. U.S. Dep't of Labor, 11 CIT 548, 551, 669 F. Supp. 432, 435 (1987) (citation omitted); 29 C.F.R. § 90.12 (2007).

The Labor Department investigator compounded the methodological flaws outlined above by failing to confront the state TAA Coordinator with the EMC Human Resource Generalist's claims that there had been no recent lay-offs. The agency investigator thus deprived the state TAA Coordinator of any opportunity to refute the EMC Human Resource Generalist's assertions, and to procure and proffer evidence of the lay-offs for the Labor Department's consideration.

As subsequent events made only all too clear, the Labor Department further erred in crediting EMC's (unsworn, unverified, and inherently contradictory) representations over the sworn statement of the state TAA Coordinator.[8] Not only did the agency fail to take any steps to resolve two directly conflicting statements on a central, dispositive issue, the agency accepted one statement and rejected

---

[8]It is worth noting that, although the Labor Department requires that displaced workers file TAA/ATAA petitions under oath, the agency imposes no similar requirement on employers completing the agency's Business Confidential Data Request questionnaire or submitting other information. *Compare* A.R. 2 *with* C.A.R. 11-16. *See generally* BMC I, 30 CIT at ____ & n.51, 454 F. Supp. 2d at 1334-36 & n.51 (discussing various means of ensuring reliability of information provided to agency by both employers and workers, and noting that employers may be prosecuted for material false statements even for statements which are not under oath).

the other without articulating any rational basis for that action.[9] No TAA case in the history of the court better illustrates the folly of the Labor Department's routine practice of crediting information provided by employers and discounting that provided by workers.

Any conceivable patina of reliability that the information provided by EMC could have had logically should have vanished when – mere days after the Labor Department denied the Workers' petition – EMC's Human Resources Generalist advised the agency that she had made a "clerical error" in the data that she had provided in response to the agency's Business Confidential Data Request. A.R. 45. Yet, when the Workers sought reconsideration of the agency's negative determination, the Labor Department continued to credit EMC's representations, and to reject those of the Workers – even though, by then, EMC's Human Resources Generalist also had been forced to concede that (contrary to her earlier assertions) lay-offs had occurred in May 2007. C.A.R. 51.[10]

[9]*See generally* Former Employees of Marathon Ashland Pipe Line, LLC v. Chao, 370 F.3d 1375, 1385 (Fed. Cir. 2004) (ruling that the Labor Department is entitled to base TAA determinations on statements of company officials "if the Secretary *reasonably* concludes that those statements are creditworthy" *and* if the statements "are not contradicted by other evidence"; but – where there is a conflict in the evidence – the agency is "precluded . . . from relying on the representations by the employer" and is required to "take further investigative steps before making [its] certification decision") (emphases added).

[10]The Human Resources Generalist's earlier claim that she was unaware of any lay-offs after the expiration of the 2005 TAA/ATAA certification strains credulity. *Cf*. BMC I, 30 CIT at _____ & n.39, 454 F. Supp. 2d at 1330 & n.39 (criticizing agency's unquestioning reliance on information provided by company's Senior Manager for Human Resources, who (*inter alia*) assertedly was unaware that her employer – a global giant in the field – mass-produced software and produced software on disk (as well as in "object code" format), who checked "unknown" in response to an agency question as to whether there had been lay-offs, and who (inaccurately) stated that no jobs had been transferred abroad; observing that "it strains credulity to suggest that the Senior Manager for Human Resources of a major multinational corporation could be so ignorant of such basic information about the nature of her employer's business, much less the overall status of the company's workforce at its facilities here at home in the U.S. *versus* abroad."), 1335 at n.51 (further discussion of same); *see also id*., 30 CIT at _____ n.34, 454 F. Supp. 2d at 1327 n.34 (noting that, if

Moreover, at the reconsideration stage, the Labor Department once again failed to vet the information on which it would rely by testing that information against the Workers in an effort to reconcile the fundamental, continuing inconsistencies between the Workers' claims and the representations made by EMC. The administrative record is replete with correspondence, e-mail exchanges, and documentation of phone conversations between the agency and EMC. In contrast, the Labor Department investigator left *a single voice mail message* for the Worker who filed the request for reconsideration, and then failed to call the Worker back, even though she was asked to do so. A.R. 52. There can be little doubt that – had the agency investigator taken the time to speak with the Worker and request documentation to support the Workers' claims of declining levels of employment at EMC – the Worker would have swiftly provided the Labor Department with the very same data which she later appended to her Complaint . . . data which the agency found so compelling. *See generally* BMC I, 30 CIT at _____ & n.40, 454 F. Supp. 2d at 1330-31 & n.40

---

agency had recognized and sought to explore and resolve inconsistencies between information provided by the Workers and that provided by company's Senior Manager for Human Resources, agency "would have been alerted to the fact that BMC's Senior Manager for Human Resources was a less than reliable source"); *id.* 30 CIT at ___, 454 F. Supp. 2d at 1333-34 (cataloguing various cases in which agency has been criticized for assuming that employers' human resources staff had requisite knowledge of company product lines, markets, operations, and personnel).

Of course, from the perspective of the Workers here, it matters little whether EMC's Human Resources Generalist was dissembling or simply ignorant – the result was the same: their petition was denied. Similarly, from the perspective of the methodological integrity of the Labor Department's TAA investigations, it matters little whether she was dissembling or simply ignorant. Either way, it illustrates the fundamental error of the Labor Department's standard practice of treating information provided by employers as inherently accurate and reliable, and generally allowing it to "trump" whatever information workers provide. *See generally* BMC I, 30 CIT at _____, 454 F. Supp. 2d at 1328-37 (criticizing agency's routine over-reliance on employer-provided information, and discussing fallacies in assuming that such information is inherently credible and reliable).

(criticizing agency for failure to contact petitioning workers, who ultimately provided key evidence which company had failed to produce).

Quite apart from methodological errors such as its over-reliance on employer-provided information, and its failure to identify and resolve discrepancies and inconsistencies in the information provided to it, the Labor Department made yet another critical mistake in its investigation in this case. Rather than targeting employment levels at EMC on the relevant dates – October 2, 2007 (the date of the petition), and October 2, 2006 (one year before) – the agency repeatedly erred by focusing on other timeframes in investigating and analyzing the Workers' claims. *See* 73 Fed. Reg. at 42,373 (defining "the relevant period" as "October 2, 2006 through October 2, 2007," in agency's Remand Determination certifying Workers for TAA/ATAA); S.A.R. 43 (same).

Thus, for example, instead of comparing employment levels on October 2, 2006 to those on October 2, 2007, the Labor Department's initial determination denying the Workers' petition was apparently predicated on the agency's finding that EMC had experienced no lay-offs or threats of lay-offs "[s]ince the expiration of [the agency's 2005 certification *on February 4, 2007*]." A.R. 27. Similarly, the Labor Department's determination denying the Workers' request for reconsideration stated that the agency had "requested . . . the relevant employment data," and concluded (erroneously, as it turns out) that "overall employment [at EMC] . . . increased from October 2006 to September 2007" (perhaps roughly October 2, 2006 to October 2. 2007). However, the "headcounts" that the agency had requested from BMC were for February 5, 2007 and October 2, 2007. There is no indication that the agency had information on employment levels as of October

2, 2006 (or even September 2006) on which it could have based its determination. 73 Fed. Reg. at

1897; A.R. 72-73; C.A.R. 54-63.

As the Workers' counsel succinctly put it:

The Department should have determined the level of employment at EMC on
October 2, 2006; and on October 2, 2007. To date, the Department's investigation
has revealed . . . the level of employment at EMC as of October 2, 2007 . . . .
However, the Department has not inquired into the level of employment at EMC as
of October 2, 2006, asking instead for the level of employment at EMC for various
other dates and ranges of time, namely: 2005, 2006, Jan-Sep 2006, and Jan-Sep
2007, pursuant to the Department's Business Confidential Data Request . . . ; and
2/5/07 and 2/5/07-10/2/07, pursuant to conversations with [EMC's Human Resources
Generalist] . . . . The relevance of the employment level at EMC for these other dates
and ranges of time is unclear.

Letter from Counsel at 4 (C.S.A.R. 21).[11]

_____

[11]As the Workers' counsel point out, the Labor Department's request for data as of February
5, 2007 (immediately following the expiration of the agency's 2005 TAA/ATAA certification), as
well as its request for data for the period February 5, 2007 through October 2, 2007 (the date of the
petition here at issue) cannot be reconciled with the agency's definition of "the relevant period" as
October 2, 2006 to October 2, 2007 (*i.e.*, the one year period preceding the date of the petition). *See*
Letter from Counsel at 4 (C.S.A.R. 21); 73 Fed. Reg. at 42,373 (defining "the relevant period" as
"October 2, 2006 through October 2, 2007"); S.A.R. 43 (same).

The Workers' counsel also implicitly criticize a table in the Labor Department's standard
Business Confidential Data Request questionnaire which seeks various data "for the last two full
years, the most recent year-to-date, and the comparable period in the previous year." In the
investigation at issue here, the Labor Department tailored the table to request data on EMC
employment levels, as well as company sales, company production, company imports of "like or
directly competitive products," and company shifts in production, for the years 2005 and 2006, as
well as data for "Jan thru Sept. 2007" and (for purposes of comparison) "Jan thru Sept. 2006." *See*
C.A.R. 12.

The language of the Business Confidential Data Request thus suggests that it is standard
Labor Department practice to seek data for the two full years preceding the year of the petition (in
this case, the years of 2005 and 2006); and, in any event, it does not appear that the agency made
any particular use of that data in this case. The agency's request for "most recent year-to-date" data
(in this case, data for "Jan thru Sept. 2007") apparently is intended to capture data up to the date of
the petition (in this case, October 2, 2007). Requesting data for a range such as "Jan thru Sept.

### III.  **Conclusion**

This TAA/ATAA investigation should have been a simple, straightforward one for the Labor Department.  EMC was no stranger to the agency; the company had previously been the subject of a TAA investigation, and had been certified by the Department.[12]  And, unlike many TAA investigations, there was no question here as to whether EMC's workers produced an "article."  Nor was there any dispute as to whether the company's sales and production had decreased, or whether imports had increased.  The sole issue was whether employment levels at EMC had declined during the relevant period – the one year period preceding the Workers' October 2, 2007 petition.  The agency thus had to do little more than obtain employment data for two dates, October 2, 2006 and October 2, 2007.

Yet the Workers were denied the TAA/ATAA benefits to which they were entitled for more than nine months, as the agency twice denied their petition – first accepting, and relying on, patently inaccurate data, and then requesting, and relying on, data for the wrong period.  *See* Former Employees of Chevron Prods. Co. v. U.S. Sec'y of Labor, 27 CIT 1930, 1942, 298 F. Supp. 2d 1338, 1349 (2003) (explaining that "as a general principle, the effectiveness of [TAA] depends upon its timeliness," and discussing the often devastating human toll of unemployment).

---

2007" makes sense for sales, production, imports, and shifts in production; but it is ambiguous (and potentially misleading) for employment data.  For example, a request for employment data for "Jan thru Sept. 2007" could reasonably be interpreted as seeking an *average* employment level for that period (among other possible readings).  If the agency is seeking a company's employment figures as of a specific date certain, its standard Business Confidential Data Request form should be revised to eliminate any ambiguity and potential for confusion.

[12]It is worth noting that the petition which led to the prior certification of EMC was filed on January 14, 2005, and was granted on February 4, 2005 – a mere 21 days later.

In its Remand Determination certifying the Workers, the Labor Department stated that – in the course of the remand investigation – the agency "was able to obtain crucial information not previously available." *See* 73 Fed. Reg. at 42,373; S.A.R. 43. But that assertion is disingenuous. The mere fact that the agency did not previously solicit, or obtain, certain information does not mean that the information was "not previously available" to it.[13] The agency had only to ask the *right question* of the *right person*.

In the instant case, the Labor Department would have rapidly reached a correct determination – conserving its own resources, as well as those of EMC, the Workers, and the Court – had the agency contacted the Workers early in the initial investigation, and requested from them the evidence that the Workers submitted with their Complaint filed with the Court, which gave the agency an entirely new perspective on the Workers' claims. It is telling that, with the benefit of the Workers' information, the Labor Department was able to obtain accurate employment data from EMC confirming the Workers' claims virtually overnight.

To be sure, employers may be uncooperative in (or, as in this case, incompetent at) providing reliable information for use in TAA/ATAA investigations. But that is all the more reason for the

---

[13]*See*, *e.g.*, Former Employees of BMC Software, Inc. v. U.S. Sec'y of Labor, 31 CIT ____, ____, 519 F. Supp. 2d 1291, 1309-10 (2007) (rejecting Government's argument that photos of packaged software (evidence that employer's software was a tangible "article" for TAA purposes) which were appended to Complaint were "unavailable to the [Labor Department]" prior to commencement of court action, where agency investigators never once contacted petitioning workers to request proof of their assertions) ("BMC II"); BMC I, 30 CIT at ____ 1321 n.24, 454 F. Supp. 2d at 1321 n.24 (*quoting* letter in another TAA case rejecting Labor Department's claim that TAA certification there was based on "new information" supplied to agency after Complaint was filed: "While it may be true that the Labor Department had previously *failed* to make the connection [between the petition there at issue and a related TAA/ATAA certification], it cannot honestly be said that the agency was '*unable*' to make the connection before the Complaint was filed.").

Labor Department to reconsider its practice of relying so heavily on employer-provided information in reaching its determinations on workers' petitions. Moreover, the Labor Department would be well-advised to be more *precise* in its requests for data and more *proactive* in its quest for accurate, credible information. This inherently means affirmatively soliciting information from petitioning workers, and scrutinizing that provided by the employers, in future cases.

In the case at bar, the Labor Department conducted a proper investigation on remand, and its Revised Determination on Remand is supported by substantial evidence in the record, and otherwise in accordance with law. *See* 73 Fed. Reg. 42,373 (July 21, 2008). The Labor Department's Remand Determination certifying the Workers as eligible to apply for TAA and ATAA benefits is therefore sustained.

Judgment will enter accordingly.

/s/ Delissa A. Ridgway
_____
Delissa A. Ridgway
Judge

Decided: December 22, 2008
          New York, New York